752 F.2d 566
 UNITED STATES of America, Plaintiff-Appellee,
v.
James L. CONNER, E. Wyllys Taylor, W. Burns Hayter, B. Homer
Darby, Sr., Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
E. Wyllys TAYLOR, et al., Defendants,
James L. Conner, Defendant-Appellant.
 Nos. 84-3008, 84-3018.
 United States Court of Appeals,
Eleventh Circuit.
 Feb. 4, 1985.
 
 David A. Maney, Tampa, Fla., for Connor.
 Gibson & Connor, Kenneth L. Connor, Lake Wales, Fla., for Taylor.
 Robert E. Puterbaugh, Lakeland, Fla., for Hayter.
 T.W. Weeks, III, Weeks, Ruster & Mislovic, Peter K. Mislovic, Lakeland, Fla., for Darby.
 Judy S. Hoyer, J. Kirk Brandfass, Asst. U.S. Attys., Tampa, Fla., for plaintiff-appellee.
 
 
 1
 Appeals from the United States District Court for the Middle District of Florida.
 
 
 2
 Before GODBOLD, Chief Judge, CLARK, Circuit Judge, and THOMAS*, District Judge.
 
 DANIEL HOLCOMBE THOMAS, District Judge:
 
 3
 These consolidated cases involve a multi-count indictment charging six defendants with racketeering in violation of Title 18, Sec. 1962(c) and conspiracy to engage in racketeering in violation of Title 18, Sec. 1962(d) and wire fraud in violation of Title 18, Secs. 1341, 1343 and Title 18, Secs. 2 and 2314.
 
 
 4
 Count One charged defendants, Taylor, Darby and Conner with engaging in a pattern of racketeering activity involving two separate real estate transactions referred to as "Farmland-Duval Transaction" and "Farmland-IMC Transaction." This Count charged the three defendants with schemes involving breaches of fiduciary duties resulting from the non-disclosure by defendant-employees of their financial interest in real estate transactions involving their employers. The acts of racketeering charged revolved around mail and wire fraud statutes.
 
 
 5
 Count Two charged the same three defendants with conspiracy.
 
 
 6
 Counts Three through Eight charged defendant, Conner, with having received secret proceeds and kickbacks which were not disclosed to his employer, Farmland. The defendants Taylor and Darby were charged as having been participants in an enterprise which schemed to conceal Conner's receipt of the secret proceeds and kickbacks.
 
 
 7
 Count Nine charged Taylor, Darby, Conner, Cleghorn, Hayter and Jennings with obtaining money by false pretenses in violation of Title 18, Sec. 1343.
 
 
 8
 Counts Ten through Twelve charged Hayter with a scheme to defraud IMC by means of false pretenses in violation of Title 18, Sec. 1343.
 
 
 9
 Counts Thirteen and Fourteen charged Hayter and Darby with defrauding IMC by means of false pretenses in violation of Title 18, Sec. 1343.
 
 
 10
 Count Fifteen charged Hayter and Cleghorn with transporting money in Interstate Commerce in violation of Title 18, Secs. 2 and 2314.
 
 
 11
 At the conclusion of the testimony, the Court granted judgments of acquittal as to Taylor, Darby and Conner under Count Two (conspiracy) and as to Hayter and Cleghorn under Count Fifteen and as to Cleghorn and Jennings on all counts. The jury returned a verdict of guilty as to Taylor in Counts One, Three through Nine; Hayter in Counts Nine through Fourteen; Conner, Counts One, and Three through Nine; and Darby in Counts One, Three through Nine, Thirteen and Fourteen. In view of the convictions on Count One (racketeering), the Court then submitted to the jury the issue of whether or not the funds which were the subject of various mailings and wire transactions described in the indictment should be forfeited to the Government, 18 U.S.C. Sec. 1963. The jury by its verdict determined that the funds described in the indictment should be forfeited and judgments in the following amounts were rendered separately against the three defendants found guilty under Count One, namely, Taylor, $1,403,288.72; Darby, $1,364,974.86; and Conner, $1,007,823.88.
 
 STATEMENT OF THE FACTS
 The Defendants
 
 12
 The defendant, E. Wyllys Taylor, at all times pertinent to this case, was Chairman of the Board of the American Bank of Lakeland, Florida. (He will hereinafter be referred to as Taylor or "the banker").
 
 
 13
 The defendant, B. Homer Darby, Sr., at all times pertinent to this case was a retired employee of Mississippi Chemical Company. He was also President of the Hub Chemical Company, the business owned entirely by members of his family.
 
 
 14
 The defendant, James L. Conner, at all pertinent times, was Vice-President in charge of fertilizer manufacturing of Farmland Industries, Inc. (He will hereinafter be referred to as Conner or Vice-President Farmland).
 
 
 15
 The defendant, W. Burns Hayter, at all pertinent times, was Vice-President of International Minerals and Chemical Corporation (IMC) and was Vice-President and General Manager of International Minerals and Chemical Development Corporation (IMCD), a wholly owned subsidiary of IMC. (He will hereinafter be referred to as Hayter.)
 
 THE FARMLAND-DUVAL TRANSACTION
 
 16
 Farmland Industries, Inc., is a cooperative corporation, the members of which are local farmer's cooperatives, principly in the mid-west. The members of the local cooperatives are individual farmers. In broad terms, the overall purpose of Farmland is to improve the economic well being of its farmer members. Its membership includes approximately 2200 local cooperatives comprised of approximately one-half million farmers. Farmland management desired that the company become "basic" or "vertically integrated" in the field of fertilizer manufacture. This means the power to control every phase of the product's development from its source of supply to marketing the finished product. Toward this end, Farmland got into phosphate operation in the early 1960's. Prior to 1976, attempts to obtain phosphate reserved had proved unsuccessful. In 1975 the Duval Company decided to sell its phosphate holdings in Hardee County, Florida. There seems to be some difference in the interpretation of the testimony as to whether or not Conner, Vice-President of Farmland, learned of this decision through one of Farmland's employees, Murphy, or whether he was advised of it by the defendant, Darby. Suffice it to say, the sale was ultimately consummated through the middleman known as Hardee Properties. Murphy, in substance testified as follows. In January 1976, Farmland, through employee Murphy, learned that the Duval Property was for sale. Murphy advised Conner, Vice-President of Farmland, of the availability of this land on January 27, 1976, at a meeting in Conner's office in Kansas City. Murphy suggested that he, Murphy, on behalf of Farmland, contact Duval directly. Conner, however, said that he, Conner, would make the contact. Conner later told Murphy that he had contacted Duval and was advised that the property was not for sale. However, in May of 1976, Conner advised Murphy that Farmland had entered into an agreement with Hardee Properties to buy the Duval Property. Conner stated that he, Conner, did not know the identity of Hardee Properties, other than S. Thomas Moore. Murphy was surprised that an unknown entity called Hardee Properties was involved in the middle of what was essentially a land transaction between two large corporations, namely, Farmland and Duval. Murphy, over Conner's objections, made sufficient inquiries to learn that Wyllys Taylor, the banker, was involved in Hardee Properties. Murphy knew of the close personal relationship between Taylor and Conner and was concerned that Taylor's involvement might prove embarrassing to Conner. However, Conner showed no reaction to this information. Murphy did not advise anyone else in Farmland of Taylor's involvement because he considered Conner the key man at Farmland and the one on whom Farmland's Board would depend to get the best possible deal.
 
 
 17
 In March 1976, Taylor, the banker, requested that Moore handle the transaction in his, Moore's, name so that Taylor's name would not be associated with the deal. On March 26th, Taylor and Darby went to Houston to meet with Douglas Bourne, the Vice-President of Duval. In September of 1976, Taylor instructed Moore to attend a meeting at Duval Headquarters in Houston. Conner, Vice-President of Farmland, accompanied the Farmland's attorney and represented Farmland at the meeting. On December 20, 1976, simultaneous closings between Duval and S. Thomas Moore Partnership and between S. Thomas Moore and Farmland were recorded. S. Thomas Moore Partnership was composed of S. Thomas Moore, E. Wyllys Taylor and B. Homer Darby, Sr. Essentially Duval sold its entire interest in approximately 6,700 acres of land along with its rights under the so-called "Coca Cola Option" for a total of $36,000,000.00. Duval took back a mortgage at 6 1/2% interest. The Moore group then deeded the mineral rights only of the property it had acquired from Duval to Farmland for the same price at 8 1/2% interest. The proceeds of the sale which went to the S. Thomas Moore Partnership was sent by wire from Missouri to Texas to Florida, then disbursed according to the partnership agreement. Moore received approximately 5%; two thirds of the remainder going to Taylor and approximately one-third going to Darby. Taylor in turn distributed the monies which he received in accordance with the provision of E. Wyllys Taylor partnership agreement, splitting the funds between Colonial Industries, the Taylor Family Partnership and Timberline Industries, the Conner Family partnership.
 
 
 18
 Farmland had a written conflict of interest policy, requiring disclosure by all top level employees of any such conflict. Conner consistently failed to disclose his receipt of these funds to Farmland. It was brought out in the trial that the defendants, Taylor and Darby had each received approximately $1,000,000.00 from this transaction and Conner more than $700,000.00. According to the terms of the mortgages which ran through 1984, the total amount of monies which they expected to receive was in excess of $6,000,000.00.
 
 FARMLAND-IMC TRANSACTION
 
 19
 The Carlton interest wished to sell property owned by it known as the Limestone Land Property. Carlton, through their realtor, approached Burns Hayter, and was advised that IMC was interested in purchasing the property. The property was contiguous to the Farmland property purchased from Duval in 1976. Farmland owned property in Hillsborough County contiguous to IMC holdings. Homer Darby purporting to act on behalf of Hub Chemical Company approached Carlton and secured an option to purchase the Limestone Land. E. Wyllys Taylor, the banker, approached IMC with the idea of trading IMC's holdings in Hardee County plus the Limestone Land property to Farmland for certain of its property. The trade was eventually effected and Hub Chemical, Darby Family ownership, was paid $1,200,000.00 for putting the deal together. The $1,200,000.00 was sent by wire from Illinois to Florida. IMC drew a check in this amount payable to Hub, which was deposited in the Trust account of Darby's son and on instructions from Darby, Sr., checks were written from these funds for $720,142.83 to a business owned by Wyllys Taylor, the banker, and another check from $9,606.76, payable to a concern owned by Burns Hayter. The $720,142.83 check was deposited in the attorney trust account of Roy Maddox, the son of a business partner of Taylor. Maddox, acting on instructions from his father and Taylor wrote a check for $281,717.17 to Conner, the Vice-President of Farmland. Conner did not disclose the receipt of these funds to his employer, Farmland, nor did Hayter disclose the receipt of funds by him to his employer, IMC, but both falsely filed conflict of interest questionaires which did not reveal that they had received such monies.
 
 THE HAYTER TRANSACTION
 
 20
 Beginning in 1979, IMC was involved in the acquisition of a great deal of real property in Hillsborough County, Florida. Burns Hayter, was the IMC employee primarily involved in this land acquisition program. Hayter approached a realtor named Stevens seeking kickbacks from these real estate transactions. It ultimately resulted in Stevens paying Hayter kickbacks in the amount of $242,000.00 on nineteen separate real estate transactions.
 
 THOMPSON-TOMLINSON TRANSACTION
 
 21
 IMC was interested in acquiring land in Polk County, Florida. The owners of the Polk County land were not interested in selling the property for cash but were interested in making an exchange. Through a series of exchanges the transactions were completed. Upon this consummation, Homer Darby was paid a consulting fee of $200,000.00, out of which he in return paid Burns Hayter, $99,000.00.
 
 THE CALDWELL TRANSACTION
 
 22
 IMC had been attempting to purchase a piece of property owned by one Caldwell. It had been listed with a realtor named Simons. Burns Hayter suggested that Simons consult Homer Darby. The property eventually was sold to IMC resulting in Darby being paid a consulting fee of $40,000.00 which he split with Hayter, giving Hayter, $20,000.00.
 
 
 23
 As to the Farmland-IMC Transaction and as to each of the Hayter Transactions, the Vice Chairman of the Board of IMC testified that had the Board been aware of Hayter's receipt of funds, the Board would not have consummated the transaction but would have attempted to re-negotiate them. He further testified that had the Board known of it, Hayter would have been terminated.
 
 
 24
 Simply stated, Taylor, a banker, used his position to help further a scheme to obtain money for himself illegally at the expense of approximately one-half million farmers. Darby and Conner agreeably went along for the ride sharing in the scheme. Hayter was in charge of purchasing real estate for his employer, IMC, in order to obtain kickbacks which were shared in by Darby, Taylor and Conner.
 
 THE DEFENSES
 
 25
 The defendants Taylor and Conner contended at the trial that the monies paid by Taylor to Conner on both the Farmland-Duval Transaction and the Farmland-IMC Transaction, were gifts and had nothing to do with the transactions themselves. In support of this defense both Taylor and Conner offered many theories; none of which were believed by the jury nor this court.
 
 
 26
 Among other defenses, Taylor told the jury that inasmuch as Conner's assistance in two projects in 1960 had helped make him, Taylor, rich, he felt a moral obligation to repay Conner in some manner. Conner contended that he did not learn until after the closing of the Farmland-IMC transaction that Taylor intended to pay him some money.
 
 
 27
 Among other defenses, Darby testified that he did not know until shortly before the closing of the Farmland-Duval transaction that Conner was to receive any monies. On cross-examination, however, he admitted that even after learning of Conner's receipt of the funds, he co-signed each of the checks from the S. Thomas Moore Partnership to Taylor, knowing that Taylor was paying Conner from the proceeds.
 
 
 28
 Hayter, while admitting that he had engaged in conflicts of interest and had lied to his employer, IMC about doing so, contended that his activities had in no way economically harmed his employer.
 
 
 29
 None of these defenses were believed by the jury and we find that the evidence amply supports the wrongdoing of the defendants. The factual issues have been resolved by the jury and their findings are adequately justified.
 
 
 30
 Of the issues raised by the defense, only one is of sufficient substance to require an in depth discussion by this Court; namely, whether or not the forfeiture judgment against the three defendants constitutes error. This will be discussed later in this opinion.
 
 
 31
 They also raise the question of whether or not the evidence was sufficient to prove a scheme to defraud.
 
 
 32
 In reviewing the sufficiency of the evidence, the Court of Appeals must view the evidence in the light most favorable to the Government. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Spradlen, 662 F.2d 724 (11th Cir.1981). Further, the appellate court must make all reasonable inferences and credibility choices which will uphold the verdict. United States v. Perez, 648 F.2d 219 (5th Cir.1981); United States v. Becker, 569 F.2d 951 (5th Cir.1978). To affirm, the court need only find that reasonable minds could have found the evidence to be inconsistent with the hypothesis of the accused's innocence. United States v. Spradlen, supra; United States v. Moreno, 649 F.2d 309, 312 (5th Cir.1981); United States v. Diaz, 655 F.2d 580 (5th Cir.1981).
 
 
 33
 Courts in all Circuits have traditionally construed the statute in such a way to effect its broad purpose: to prohibit fraudulent enterprises. The fraudulent aspect of a scheme to "defraud" is measured by a nontechnical standard. Gregory v. United States, 253 F.2d 104 (5th Cir.1958).
 
 
 34
 Specifically, the type of fraud which is perpetrated through a breach of the fiduciary duty owed by an employee to his employer has been held to be actionable under the mail and wire fraud statutes. Shushan v. United States, 117 F.2d 110 (5th Cir.1941); Bradford v. United States, 129 F.2d 274 (5th Cir.1942); United States v. George, 477 F.2d 508 (7th Cir.1973); United States v. Bryza, 522 F.2d 414 (7th Cir.1975), cert. denied, 426 U.S. 912, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976); United States v. Von Barta, 635 F.2d 999 (2d Cir.1980), and cases cited therein. See also, United States v. Newman, 664 F.2d 12 (2d Cir.1981). Such a breach of duty may involve an employee's failure to disclose material information to his employer. United States v. Ballard, 663 F.2d 534 (5th Cir. Unit B, 1981), modified 680 F.2d 352 (5th Cir. Unit B, 1982). Ballard, supra, held that a breach of a fiduciary duty must be accompanied by some "detriment" to the employer in order to constitute a violation.
 
 
 35
 All defendants contend that Farmland and IMC suffered no economic detriment because prices paid by them were within the fair market values, and without detriment they could not be convicted under the Wire Fraud Statute and thus not under RICO either. All substantive offenses arise under the wire fraud statute, 18 U.S.C. Sec. 1343 (1982), which is patterned on Sec. 1341, and except for the mode of transmittal prohibits the same conduct. Under Ballard, supra, a breach of fiduciary duty constitutes an illegal fraud under Sec. 1341 only where there is some detriment to the employer.[1]
 
 
 36
 In its modified opinion the Ballard court noted that in an unregulated market the detriment necessary for a finding of mail fraud would be shown by mere receipt of kickbacks. 680 F.2d at 354 n. 5.
 
 
 37
 All but one of the transactions here fit the Ballard model of employer detriment. The Duval deal is an example. Duval was willing to part with the fee simple rights at X price to be financed at 6 1/2 percent interest. Farmland purchased only the mineral rights at X price, financed at 8 1/2 percent. Although the price Farmland paid may have been within the range of prices encompassed within the fair market value of the land had Farmland bought directly from Duval, Duval still would not have demanded more. Farmland could have captured the fee simple rights rather than merely the mineral rights and also could have obtained the benefit of the lower interest rate. The insertion of Hardee Properties (i.e. Farmland's employee Conner and his co-defendants Darby and Taylor) into the deal caused Farmland to suffer detriment to the extent of the difference between what Duval was willing to accept and what Farmland eventually paid Hardee. The Farmland-IMC deal, the Hillsborough County deal, and the Caldwell transaction analyze out the same way.
 
 
 38
 The Thompson-Tomlinson deal does not fit this analysis because of the three-party nature of the transaction. IMC and Thompson had agreed before anything else happened that IMC would be willing to pay X for the Thompson land. IMC did in fact pay X for the land when Thompson found the Tomlinson property in which to reinvest those proceeds. Thompson then paid some amount to Tomlinson, who in turn paid the kickback to the defendants. Thus the kickback did not increase the price IMC paid or decrease the amount Thompson would have been willing to accept for it. Because the kickback came out of the third party's pocket in connection with the deal between Thompson and the third party, it is unrelated to the Thompson-IMC transaction. The breach of fiduciary duty and the acceptance of the kickback did not create any "detriment" as defined by the Ballard court. The convictions of Hayter and Darby on Count 13 must, therefore, be reversed. This does not affect their sentences, nor does it reduce the amount of the RICO forfeiture. The forfeiture only goes to the Duval and IMC deals, not the other transactions.
 
 
 39
 The jury instructions on detriment were correct. The constituent elements came out of Ballard. The jury found that the evidence was sufficient. We agree.
 
 
 40
 The defendants question the sufficiency of the evidence to prove that the defendants caused the use of interstate wire facilities in Count Nine. Certainly from the evidence adduced the defendants could reasonably foresee that there would be interstate transfer of funds in carrying out the scheme to defraud.
 
 
 41
 Another of the defenses puts in issue the constitutionality of the mail fraud statutes. Sections 1341 and 1343, Title 18, have been discussed on numerous occasions. The wire fraud statute is to be interpreted the same as the mail fraud statute and a finding of one being constitutional would necessarily be a finding that the other is constitutional. U.S. v. Computer Sciences Corp., 689 F.2d 1181 (4th Cir.1982), cert. denied, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); U.S. v. Giovengo, 637 F.2d 941 (3rd Cir.1980); U.S. v. Louderman, 576 F.2d 1383 (9th Cir.1978), cert. denied, 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978). Several courts have held the mail and wire fraud statutes facially constitutional in the face of challenges such as this. Durland v. U.S., 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896) (Interpreting a predecessor statute); U.S. v. Gartman, 145 F.Supp. 420 (E.D.Pa.1956); U.S. v. Attaway, 211 F.Supp. 682 (W.D.La.1962); U.S. v. Bohonus, 628 F.2d 1167 (9th Cir.1980).
 
 
 42
 The contention that the wire and mail fraud statutes as applied in this case violate the defendants' Fifth Amendment right to due process and Sixth Amendment right to be reasonably forewarned of what conduct is criminal is of no avail. In the case of U.S. v. Mazurie, 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975), we find the following: "It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." These defendants were indicted for a "fiduciary fraud" in violation of Title 18, Sec. 1343. The application of this to the mail and wire fraud statutes has frequently been recognized. U.S. v. George, supra. Wire fraud is a "specific intent" crime, and the specific intent is also required when a fiduciary fraud is alleged. U.S. v. O'Malley, 707 F.2d 1240 (11th Cir.1983). The Bohonus case, supra, states: "A statute meets the standard of certainty required by the Constitution if its language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." The case of Colautti v. Franklin, 439 U.S. 379, 395, 99 S.Ct. 675, 685, 58 L.Ed.2d 596 (1979), states that "This Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of mens rea." "The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware." Screws v. U.S., 325 U.S. 91, 102, 65 S.Ct. 1031, 1036, 89 L.Ed. 1495 (1945). There is no merit in the claim of unconstitutionality.
 
 
 43
 The defendant Taylor raised the defense that he was acting on the advice of his attorney. He cannot prevail on this ground. The jury rejected this argument and we agree. The testimony plainly shows that he did not make a full and fair disclosure to his attorney. He did not consult his attorney in good faith for the purpose of securing advice on the lawfulness of his future conduct.
 
 
 44
 The defendant Darby raised the defense of misjoinder and moved for severance. He cannot prevail on this issue as the indictment charged him with having participated in the same offense as the other defendants. U.S. v. Bright, 630 F.2d 804, 813 (5th Cir.1980), where it is stated by Judge Kravitch: "... The gist of the RICO offense, ... is that the defendant, through a pattern of predicate crimes, furthered a racketeering enterprise. The offense charged here is not the commission of the predicate crimes, but the furthering of the enterprise. United States v. Elliott, 571 F.2d 880 (5th Cir.1978), cert. denied, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). Thus viewed, it is clear that the defendants were alleged to have participated in the same offense and joinder was not improper under Rule 8."
 
 
 45
 In consolidated Case No. 84-3018, the defendant Conner argues that the jury was mislead by the government's final argument in the forfeiture proceeding. The portion of the argument which it criticized is as follows: "Now, if this money is forfeited to the United States, Farmland has the complete right to make a claim against it as the rightful owner." After the jury retired, it sent the following message to the Court. "Dear Judge Hodges, can Farmland lay claim to monies forfeited to U.S. Government? Is this true or possible?" The Court made the following response. "Members of the Jury, in response to your question, you are instructed that under the applicable statute, 18 U.S.C. Section 1963(c), Farmland could lay claim to any monies which might be forfeited to the United States. However, under the statutes, whether and to what extent any forfeited monies might then be relinquished to Farmland is a determination that would be made by the Attorney General." We find no reversible error in this argument. Judge Hodge's reply to the jury's inquiry was a correct statement of the law.
 
 FORFEITURE
 
 46
 Title 18, Section 1963(a)(1) reads in part as follows:
 
 
 47
 (a) Whoever violates any provision of Section 1962 of this chapter shall be fined not more than $2,500 or imprisoned not more than 25 years or both and shall forfeit to the United States, (1) Any interest he has acquired or maintained in violation of Section 1962.
 
 
 48
 Defendants Taylor, Darby and Conner were each found guilty by the jury of violating Section 1962 (Count 1, Racketeering). Following the conviction the jury was for the first time informed of the "forfeitures" section of the indictment. Counsel were afforded opportunity to make arguments to the jury and the court instructed the jury on the applicable law. After deliberation, the jury returned special verdicts against the defendants as follows: Taylor, the amount of $1,403,288.72; Darby, $1,364,974.86; and Conner, $1,007,823.88. In each instance Judge Hodges rendered the following order: "... that the amount of (specifying the appropriate amount) is hereby granted in favor of the United States of America and against the defendant (specifying him) for which let execution issue." Each of the above three defendants has claimed the forfeiture judgment is error. They in general specify three grounds: (1) that the government did not trace the proceeds to identifiable assets belonging to the defendants; (2) that the government did not prove a nexus between these assets and the racketeering enterprise claimed in the indictment and (3) that the forfeiture of these assets would constitute a denial of due process and cruel and unusual punishment in violation of the Fifth and Eighth Amendments. The defendants must fail on all three arguments.
 
 
 49
 We are first concerned with the meaning of the phrase "any interest" as set out in 1963(a)(1). The jury has decided that each of these defendants received kickbacks in violation of Sec. 1962(c). If those kickbacks qualify as an "interest" as used in 1963(a)(1) then they are forfeitable. Section 1963(a)(1) was interpreted by the Supreme Court in the case of Russello v. U.S., 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983). In that case the defendant was engaged in racketeering, namely, collecting insurance proceeds from buildings damaged or destroyed by arson. The amounts of insurance collected and dates were specified in the indictments. We quote from Russello, "Every property interest, including a right to profits or proceeds may be described as an interest in something. Before profits of an illegal enterprise are divided, each participant may be said to have an "interest" in the ill gotten gains. After distribution, each will have a possessory interest in currency or other items so distributed. We therefore conclude that the language of the statute plainly covers the insurance proceeds petitioner received as a result of his arson activities." (emphasis added).
 
 
 50
 The RICO statute received attention in the case of U.S. v. Cauble, 706 F.2d 1322. We quote from page 1349. "The RICO forfeiture is in personam: a punishment imposed on a guilty defendant. It deprives that defendant of all of the assets that allow him to maintain an interest in a RICO enterprise, regardless whether those assets are themselves "tainted" by use in connection with the racketeering activity."
 
 
 51
 We find in the case of U.S. v. L'Hoste, 609 F.2d 796 (5th Cir.1980), Footnote 15 on page 813, "the forfeiture penalty incorporated in Section 1963 differs from other presently existing forfeiture provisions and federal statutes. Under other statutes, the forfeiture proceeding is in rem against the property, since the property being forfeited is itself considered the offender, and the forfeiture is no part of the punishment for the criminal offense. By enacting Section 1963, however, Congress revised the concept of forfeiture as a criminal penalty against the individual, since the proceeding is in personam against the defendant and the forfeiture is part of the punishment."
 
 
 52
 The indictment has cataloged each payment received by these defendants by check and by date. Thus, we see that the extent of the interest which is subject to criminal forfeiture was plainly alleged in the indictment and they were all transmitted by wire and all were received by the defendants in violation of Section 1962. Since the forfeiture is in personam, it follows the defendant as a part of the penalty and thus it does not require that the government trace it, even though the forfeiture is not due until after conviction. Money is a fungible item. It matters not that the government received the identical money which the defendants received as long as the amount that was received in violation of the racketeering statute is known. The forfeiture in this case is for a specific amount of money. It is in personam and is a money judgment against the defendant for the same amount of money which came into his hands illegally in violation of Title 18, Section 1963(a)(1). It is stated in U.S. v. Huber, 603 F.2d 387, 396 (2d Cir.1979), RICO is innovative in that it imposes forfeiture "directly on the individual as part of criminal prosecution rather than a separate proceeding in rem against the property." Cert. denied, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759.
 
 
 53
 Judge Alvin Rubin gives an excellent history of RICO in the Cauble case, supra. On page 1345, Judge Rubin states: "Congress added the forfeiture provision to RICO in order to attack the sources of economic power of organized crime in addition to removing from power and imprisoning those individuals who violate the statute. It viewed the sanctions and remedies against organized crime then available to the government as 'unnecessarily limited in scope and impact.' As enacted the forfeiture provisions are meant to reach 'the ill-gotten gains of criminals where they enter or operate an organization through a pattern of racketeering activities.' " On page 1350, Judge Rubin states: "We reiterate that property forfeited under RICO need not be 'guilty'."
 
 
 54
 We realize that the defendants rely heavily on the case of U.S. v. McManigal, 708 F.2d 276 (7th Cir.1983). In the McManigal case, the defendant appealed from a conviction of mail fraud and racketeering under 18 U.S.C. Sec. 1962, which charged McManigal, a Chicago attorney, for knowingly participating in a scheme to defraud Cook County citizens of their right to have faithful and honest services of two employees of the Cook County Board of Tax Appeals and that as a result of the fraud the law firm in which the defendant had an interest illegally obtained $249,250.00 in legal fees in the form of accounts receivable. Count 16 of the indictment sought forfeiture of accounts receivable of the law firm. McManigal had a 40% interest in this $249,250.00 in fees. The forfeitures specifically spelled out that the forfeiture was for accounts receivable in the amount of $99,700.00. The Court in reversing the forfeitures stated among other things, "An interest in accounts receivable, however, may vanish once the accounts are paid up." In the instant case, the forfeiture is against a specific amount of money, paid directly to the defendants, and not to a firm in which the defendant had an interest. Fees owed to a firm are in the nature of accounts receivable. That distinguishes McManigal from the instant case. The forfeiture in McManigal was under 1963(a)(2) and not 1963(a)(1). McManigal was reversed in part by the Seventh Circuit on December 20, 1983, 723 F.2d 580. The Seventh Circuit specifically states in the reversal, after affirming the conviction, reaffirms the original case, "insofar as it holds that the United States can only recover whatever accounts receivable were still in existence at the time of the defendant's conviction. (708 F.2d at 287-290). Therefore the district court's order forfeiting $99,700 to the United States remains reversed."
 
 
 55
 This is a money judgment and the creditor need not trace the proceeds to identifiable assets.[2]
 
 
 56
 The defendants next raise the claim that the government did not prove the nexus between these assets and the racketeering enterprise claimed in the indictment. The jury decided this issue by its verdict and needs no further comment.
 
 
 57
 The defendants next claim that forfeiture of these assets would constitute a denial of due process and cruel and unusual punishment in violation of the Fifth and Eighth Amendments. In their argument they state that the order issued by Judge Hodges "subjects this defendant to a penalty which is disproportionate to the crime and at odds with the Congressional objective in enacting ths statute." This argument will not stand up. The forfeiture is for the exact amount of money which each defendant illegally received in violation of Title 18, Section 1962.
 
 
 58
 The Fifth Circuit en banc in U.S. v. Martino, 681 F.2d 952 at page 961, states: "The plain language of the statute, its remedial and deterrent purposes, and the legislative history all compel the conclusion that Section 1963(a)(1) encompasses forfeiture of the income or profits of racketeering activity." It is further stated in Martino at page 960 and 961: "At oral argument the question was raised as to whether the government has an obligation to trace and identify the current form of monetary proceeds before it may collect on a forfeiture order. Clearly, this issue goes to collectibility and related procedures and not to the type of interest forfeitable under 1963(a)(1)."
 
 
 59
 The advisory committee on the Federal Rules of Criminal Procedure specifically amended Rule 32(b)(2), F.R.Cr.P. to "provide procedural implementation" of the criminal forfeiture. That rule provides that "[w]hen a verdict contains a finding of property subject to a criminal forfeiture, the judgment of criminal forfeiture shall authorize the Attorney General to seize the interest or property subject to forfeiture, fixing such terms and conditions as the Court shall deem proper." (Emphasis added) Therefore, all due process requirements can be satisfied through Court supervision.
 
 
 60
 The Fifth Circuit affirmed the judgment of the district court on the forfeiture issue. The posture both legally and factually of the Martino case and the instant case are indistinguishable. The forfeiture in both cases was for a money judgment against the exact amount of money which came directly into the defendants' hands as a result of their illegal violation of Section 1962.
 
 
 61
 The Supreme Court in Russello v. U.S., supra, concluded with this statement: "We therefore disagree with the reasoning of the respective courts in the Marubeni, McManigal, Meyers and Thebis cases, and we affirm the judgment of the U.S. Court of Appeals of the Fifth Circuit." This, though called by a different name, is the Martino case recorded in 681 F.2d 952, above discussed.
 
 
 62
 The judgment of the district court is AFFIRMED except as to the defendants Hayter and Darby, whose convictions under Count 13 are REVERSED.
 
 
 
 *
 Honorable Daniel H. Thomas, U.S. District Judge for the Southern District of Alabama, sitting by designation
 
 
 [1]
 Cases construing Sec. 1341 apply to construction issues involving Sec. 1343. U.S. v. Computer Sciences Corp., 689 F.2d 1181 (4th Cir.1982), cert. denied, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); U.S. v. Giovengo, 637 F.2d 941 (3rd Cir.), cert. denied, 450 U.S. 1032, 101 S.Ct. 1743, 68 L.Ed.2d 228 (1981)
 
 
 [2]
 The "Comprehensive Forfeiture Act of 1984" amended 18 U.S.C. Sec. 1963. This amendment is exactly in line with what has been stated above with regard to forfeiture. Section C. of this amendment states: "All right, title, and interest in property described in Subsection (a) vest in the United States upon the commission of the Act giving rise to the forfeiture under this section