### UNITED STATES of America

v.

### DELCO WIRE AND CABLE CO., INC. and Delco Electronics Corporation.

Crim. Nos. 87–194–01, 87–194–02.

United States District Court, E.D. Pennsylvania.

July 23, 1991.

Karl Lunkenheimer and S.C. Jaipaul, Asst. U.S. Attys., for U.S.

Marc Durant & Associates, Robert M. Wolff, (arraignment only), Barry F. Schwartz, Norman Greenspan, Philadelphia, Pa., for Security Pacific Business Credit Inc.

Nathanial Friends, Fairfax, Va., for AT & T Information Systems, Inc.

Gary M. Schildhord, Philadelphia, Pa., for Trustee Richard J. Geary.

Roslyn G. Pollak, Philadelphia, Pa., for K & W Assoc.

## MEMORANDUM AND ORDER

SHAPIRO, District Judge.

Delco Wire and Cable Co., Inc. and Delco Electronics Corp. (collectively "Delco") entered a plea of guilty to a multicount indictment, including charges under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* The court entered an Order of Forfeiture and appointed a Trustee to liquidate the company. Before the court are the petition of Security Pacific Business Credit Inc. for a hearing to adjudicate its interest in forfeited property and the government's application for an order directing Security Pacific to return forfeited property to the United States.

## I. FACTS

On May 19, 1977, Delco entered into an Accounts Receivable Security Agreement ("the Agreement") with Armstrong Business Credit Corp. The Agreement provided that Armstrong would lend Delco an amount no greater than eighty-five percent of Delco's accounts receivable. *See* Pet. Ex. 1A at ¶ 2; N.T. 10/24/88 at 73. Delco agreed that as it received payments for receivables, they would immediately be delivered to Armstrong. Pet. Ex. 1A at ¶ 2. As Delco made payments, Armstrong extended additional credit to the company against new receivables. The interest rate on the amounts borrowed was set at 5% above the prime rate charged by Citibank, N.A. *Id.* at ¶ 3.

Delco assigned to Armstrong a security interest in all its accounts receivable "whether now existing or hereafter arising," *id.* at ¶ 1, all present and after-acquired inventory, Pet. Ex. 1B at ¶ 1, and all owned or after-acquired machinery and equipment, Pet. Ex. 1C at ¶ 1. The Agreement had an initial term of two years with an automatic renewal "for successive periods of one year unless terminated by either party on the anniversary of its effective date." *Id.* at ¶ 8.

In 1980, the parties extended the Agreement for a two-year period (until February 7, 1982) and adjusted the interest rate to 4% above the Citibank rate. Pet. Ex. 1D.

In 1981, Armstrong was purchased by Security Pacific Bank and Armstrong's name was changed to Security Pacific Business Credit, Inc. ("Security Pacific"). The Agreement was amended in Security Pacific's name on March 4, 1982, and extended until May 19, 1983. Pet. Ex. 1E. The interest rate was adjusted again on May 1, 1983. Pet. Ex. 1F.

On May 7, 1987, a grand jury returned a 112–count indictment (Cr. No. 87–194) against Delco Wire and Cable Co., Delco Electronics Corp., John Flynn, president and 50% shareholder of Delco, Michael Flynn, a Delco employee, and James Barton, president of an affiliated company. Count Two of the indictment alleged that defendants engaged in a pattern of racketeering in violation of RICO from on or about December, 1973 until May, 1984. The racketeering conduct consisted of a scheme and artifice to defraud the government by selling defective wire to the United States Defense Industrial Supply Center ("DISC"). The indictment also alleged that principals of Delco bribed government officials at DISC to obtain pre-award information concerning wire and cable procurement contracts. The RICO count charged that Delco property was subject to forfeiture under 18 U.S.C. § 1963(a), including, but not limited to, $10 million Delco had received from contracts awarded by DISC from 1973 to 1984.

A grand jury, by superseding indictment that same day (Cr. No. 87–162–01), charged Paul Jesko, the other 50% shareholder of Delco, with conspiracy, mail fraud, obstruction of justice, and making and subscribing to false tax returns.

On May 14, 1987, the government moved for a restraining order prohibiting defendants herein from alienating property and/or transferring funds subject to forfeiture under the indictment pending the criminal trial. That motion was deemed withdrawn without prejudice on June 25, 1987, after the parties reached an agreement ("the stipulation"), entered as an order of the court, requiring Delco to provide the United States Attorney fifteen days notice before altering the ownership interests of Delco shareholders, directors or officers, or transferring Delco funds to them. Notice was also required before Delco could:

> Other than in the ordinary course, * * * pledge, sell, transfer, or dispose of any substantial assets of the business * * *.

*See* Order of June 24, 1987. Despite the stipulation, the Agreement between Delco and Security Pacific continued in effect after the Delco indictment.

On September 23, 1987, Michael Flynn pled guilty to two counts of mail fraud. On November 30, 1987, James Barton pled guilty to five counts of making false statements to a government agency. On December 4, 1987, John Flynn pled guilty to five counts of making false statements to a government agency, and two counts of filing false tax statements. Paul Jesko pled guilty to fifteen counts of the separate superseding indictment on December 2, 1987, before United States District Judge Clifford Green.

Because Security Pacific had been advised that Delco intended to cease operations "in the near future"—the bank decided to exercise certain discretionary rights under the Agreement. *See* Government's Response to Memorandum of Law of Security Pacific, Ex. 8. On December 27, 1987, Security Pacific advised Delco that it intended to reduce advances from 85% to 75% of available receivables and limit cash advances to the amount of daily collections. *Ibid.*

On February 2, 1988, Delco Wire & Cable Co. pled guilty to one count of conspiracy, one count of RICO, twenty-eight counts of mail fraud, and thirty-five counts of making false statements to a government agency. Delco Electronics Corp. pled guilty to one count of conspiracy, one count of RICO, eleven counts of mail fraud, and sixty-five counts of making false statements to a government agency. The court ordered forfeited to the government "to the extent set forth in the indictment all the property, interests, monies and assets of the defendants and all of the stock of defendant Delco Electronics Corporation." See Order of Forfeiture (Feb. 26, 1988). The court appointed a trustee to wind up Delco's affairs and liquidate the company. See Order of March 1, 1988.

Delco owed Security Pacific $817,802.05 on the date the Order of Forfeiture was entered. See Pet. Ex. 4. Thereafter, the Trustee collected all checks sent to Delco in payment of accounts receivable. See Order of March 1, 1988, at ¶ 1.c. None of those checks were turned over to Security Pacific as was the practice prior to the Order of Forfeiture.

Security Pacific timely filed a petition for a hearing to adjudicate the validity of its interest in property seized by the government. Security Pacific maintained that because it had a perfected security interest in Delco's inventory and accounts receivable under the Agreement, property of Security Pacific could not be forfeited to the government as property of Delco.

The government, opposing Security Pacific's petition, claimed that under the relation-back provision of RICO, $10 million of Delco's illegally obtained property vested in the government when Delco's criminal activities began in 1973. The government maintained that Security Pacific's purported security interest in Delco's accounts receivable was invalid because the government's rights to the property vested before the security interest was created.

The government also sought return of $7,807,869.73 Delco had paid to Security Pacific in accordance with the Agreement in the period between the return of the indictment and entry of the Order of Forfeiture (May 7, 1987—February 26, 1988). The government claimed that title to that money vested in the government in 1973 and was subject to forfeiture under 18 U.S.C. § 1963(e).

A hearing was scheduled on Security Pacific's petition to adjudicate the validity of its security interest and the parties conducted discovery. The court bifurcated the proceedings. The purpose of the first hearing was to determine when Security Pacific obtained its security interest in the disputed property. The purpose of the second hearing would have been to determine if, at the time Security Pacific obtained a security interest, it had reason to know that the accounts receivable were subject to forfeiture.

## II. DISCUSSION

### A. Application of the 1984 Amendments to RICO

The motions before the court concern the criminal forfeiture provisions of RICO, 18 U.S.C. § 1963. Those provisions were enacted in 1970 and substantially amended in 1984. During the hearing on the motions, the court ordered the parties to address whether the amended version of RICO applies to this case in view of the fact that Delco's criminal activity ceased before the effective date of the amendment. At issue is application of the relation-back doctrine (18 U.S.C. § 1963(c)) and the innocent third party provision (18 U.S.C. § 1963(l)).

### 1. History of Criminal Forfeiture

Criminal forfeiture was infrequently employed in the United States prior to 1970. Traditionally, forfeiture was a civil proceeding in rem against the property sought by the government. The guilt or innocence of the property owner was irrelevant because, in theory, the property had committed the illegal act. Because the property was tainted, title vested (or "related-back") to the government on the date the illegal conduct commenced. See United States v. Nichols, 841 F.2d 1485, 1486 (10th Cir.1988). Transfers of property to a

third party occurring after title effectively vested in the government were void. *United States v. Long,* 654 F.2d 911, 916 n. 9 (3rd Cir.1981).

Criminal, or *in personam,* forfeiture was reintroduced into federal law by the Organized Crime Control Act of 1970, 18 U.S.C. § 1963, and parallel provisions of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 853. Under the 1970 version of RICO, a convicted defendant forfeited to the government any interest acquired through racketeering activity and any property right affording a source of influence over a RICO enterprise. 18 U.S.C. § 1963(a) (1982). The statute imposed *in personam* forfeiture as a penalty against the criminal defendant; the forfeiture was not a separate proceeding against the property. *United States v. Long,* 654 F.2d 911, 916 (3rd Cir.1981).

In 1984, the Comprehensive Crime Control Act, Pub.L. No. 98–473, 98 Stat. 1837, ("the 1984 Act) amended the criminal forfeiture provisions of RICO "to enhance the use of forfeiture, and in particular, the sanction of criminal forfeiture, as a law enforcement tool * * *." S.Rep. No. 225, 98th Cong., 2d Sess. 191, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3374. The effective date was October 12, 1984.

## 2. *Relation–Back Doctrine*

■ Section 302 of the 1984 Act amended 18 U.S.C. § 1963(c) to read:

All right, title and interest in property described in subsection (a) vests in the United States upon the commission of the act giving rise to forfeiture under this section.

Security Pacific contends that the amended § 1963(c), which codifies what is known as the relation-back doctrine, should not govern this case because Delco's criminal activity occurred prior to the 1984 Act's effective date. Applying the relation-back doctrine retroactively, Security Pacific maintains, violates the Ex Post Facto Clause of the Constitution.

■ Two elements must be present for a criminal law to be *ex post facto:* it must apply to events occurring before its enact-

ment and it must disadvantage the person affected by it. *See Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981). A legislature may not "make[ ] more burdensome the punishment for a crime, after its commission." *Beazell v. Ohio,* 269 U.S. 167, 169–170, 46 S.Ct. 68, 68–69, 70 L.Ed. 216 (1925).

Retroactive application of the amended § 1963(c) does not violate the Ex Post Facto Clause because, in this circuit, the relation-back doctrine applied to a RICO forfeiture even before the statute was amended in 1984. In *United States v. Long,* 654 F.2d 911 (3rd Cir.1981), the Court of Appeals upheld a restraining order enjoining disposition of property that had been transferred from a criminal defendant to a third party. The court stated that although forfeiture under 21 U.S.C. § 848(a)(2) (1982) (a statute identical to the criminal forfeiture provisions of the pre–1984 version of RICO) was *in personam* not *in rem,* failure to apply the relation-back doctrine would frustrate the statute's purpose by allowing the defendant to escape a forfeiture penalty "simply by transferring his illgotten profits to a nonindicted third party." *Id.* at 916. The restraining order was valid because property in the third party's possession would be subject to forfeiture under the relation-back doctrine if the government proved the defendant's guilt. *See also United States v. Ginsburg,* 773 F.2d 798, 801 (7th Cir.1985) (en banc), *cert. denied,* 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986).

Under *Long,* the relation-back doctrine would apply to Delco's forfeiture even under the pre–1984 version of RICO. Because neither Delco nor Security Pacific is disadvantaged by application of the 1984 Act, there is no *ex post facto* violation.

## 3. *Innocent Third Party Provisions*

Prior to the 1984 Act, a third party suffering property loss from criminal forfeiture could apply to the Attorney General for remission or mitigation of forfeiture. *See* 18 U.S.C. § 1963(c) (1982). The Attorney General was required merely to make "due provision for the rights of innocent

persons." *Ibid.* The Attorney General's disposition of a petition for equitable relief was discretionary and not subject to judicial review. S.Rep. No. 225, 98th Cong., 2d Sess. 209, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3392.

The 1984 Act expanded the rights of a third party adversely affected by a criminal forfeiture by permitting a court challenge to the validity of a forfeiture order. Under 18 U.S.C. § 1963(*l*), a third party claiming an interest in forfeited property is entitled to an evidentiary hearing to determine the validity of that interest. If the third party prevails, the court must amend the order of forfeiture. *See* 18 U.S.C. § 1963(*l*)(6).

There is no legislative history suggesting that Congress intended to allow a third party claiming an interest in property forfeited as a penalty for crimes committed *prior* to the effective date of the 1984 Act to benefit from the amended § 1963(*l*). Nonetheless, the government concedes that the 1984 Act governs this case and has waived any claim that 18 U.S.C. § 1963(*l*) does not apply retroactively.

### B. Government's Application for Return of Forfeited Property

From May 7, 1987, until February 26, 1988, Delco paid Security Pacific $7,807,869.73 ("the $7.8 million") under the Agreement. *See* Response of Security Pacific to Application of the United States at ¶ 8. Security Pacific loaned Delco $5,248,-000 during that same period. In accordance with 18 U.S.C. § 1963(e), the government seeks return of the $7.8 million, or in the alternative Security Pacific's net gain of $2,559,869.73. Section § 1963(e) provides that:

> Upon conviction of a person under this section, the court shall enter a judgment of forfeiture of the property to the United States and shall also authorize the Attorney General to seize all property ordered forfeited upon such terms and conditions as the court shall deem proper. Following the entry of an order declaring the property forfeited, the court may, upon application of the United States * * * take any other action to protect the interest of the United States in the property ordered forfeited.

The government's motion is presumably an action to protect its interest in "property ordered forfeited." The issue before the court is whether the $7.8 million was included in the Order of Forfeiture.

The court ordered property forfeited "to the extent set forth in the indictment." The Indictment listed three categories of property subject to forfeiture by each of the two corporate defendants, Delco Wire & Cable and Delco Electric Company:

1. All "interests which [they] derived from racketeering activity, proceeds, property and other legal and equitable interests obtained with those proceeds * * * acquired from the United States Department of Defense, DISC, from contract awards during the years 1973 through 1984 * * *.

2. Property constituting, or derived from, proceeds which it obtained * * * from racketeering, * * * but not limited toy [sic] monies in the approximate amount of $10,000,000 which were acquired by DELCO from the Department of Defense, DISC from contract awards during the years 1973 through 1984.

3. 100% of the common stock of Delco Electronics Corp.

*See* Indictment at 42–44.

There is no proof on record that the $7.8 million falls into any of these categories. Indeed, common sense suggests that most of this money was not derived from racketeering—it was essentially a repayment of loan principal and interest to Security Pacific. In the absence of proof tracing the $7.8 million to illegal activities, the government cannot support its claim that the funds have been "ordered forfeited."

The fact that Delco violated RICO, a crime requiring an *in personam* forfeiture, does not relieve the government of its burden to establish a relationship between the $7.8 million transferred to Security Pacific and Delco's racketeering. There is no legal authority supporting the proposition that the government may seize property transferred by a RICO defendant to a third party without proving that the property

was linked to the defendant's illegal actions. Cases holding that the government may seize property without "tracing" assets are limited to instances when the government seeks property owned by a convicted RICO defendant. *See United States v. Robilotto*, 828 F.2d 940, 948–949 (2d Cir.1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 662 (1988); *United States v. Ginsburg*, 773 F.2d 798 (7th Cir.1985) (en banc), *cert. denied*, 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986); *United States v. Conner*, 752 F.2d 566, 577 (11th Cir.), *cert. denied sub. nom.*, 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985).

For example, in *Ginsburg* the defendant was convicted of bribing tax court employees to obtain favorable treatment for his clients. The district court ordered Ginsburg to forfeit $225,000 in legal fees acquired from this illegal scheme even though there was no proof that the money in Ginsburg's possession was actually derived from racketeering. Upholding the forfeiture order, the court reasoned that because an *in personam* forfeiture is a criminal penalty running against the individual defendant, it "does not matter whether the government recovers the identical dollars that the defendant received in violation of [RICO] as long as the amount that the defendant acquired in violation of the statute is known." *Id.* at 801. The court concluded that the government's right to seize a criminal defendant's assets is "not limited to whatever is left over or unspent at the time of conviction," but extends to "the entire amount that was acquired by the defendant in violation of RICO." *Ibid.*

■ *Ginsburg* and the other cases cited emphasize that the government is not required to trace assets in an *in personam* forfeiture when it seeks property of the defendant because the forfeiture is like a "money judgment" that runs against a defendant until satisfied in full. *See ibid; United States v. Conner*, 752 F.2d at 577. Any property owned by the defendant, whether or not derived from racketeering, can be used in satisfaction of the *in per-*

*sonam* forfeiture. Accordingly, when the court ordered forfeited at least $10 million of Delco's racketeering proceeds, the government seized everything Delco owned on the date the Order of Forfeiture was entered. However, the $7.8 million sought by the government was transferred to Security Pacific—in what appears to be an arms-length transaction—prior to entry of the Order of Forfeiture. Absent a showing that those funds were fraudulently conveyed to avoid the forfeiture, *see* 39 Pa.S. § 359, they cannot be seized in satisfaction of the "judgment" against Delco.

■ Property transferred to a third party that is not derived from racketeering can only be forfeited to the government if it is returned to the criminal defendant. For example, in a separate forfeiture proceeding in this case, the Trustee has moved for a order requiring certain Delco officers and employees to reimburse the corporation for their use of corporate funds to pay personal attorney's fees. The Trustee maintains that the funds are recoverable by Delco because they were fraudulently conveyed; he does not contend that the funds are directly subject to forfeiture simply because they were once the property of Delco.

Placing the burden of tracing assets on the government is not inconsistent with the detailed set of procedures, set forth in 18 U.S.C. § 1963(*l*), under which a third party may petition the government for the return of forfeited property. Under § 1963(*l*), the third party is entitled to return of the property "ordered forfeited to the United States," *see* 18 U.S.C. § 1963(*l*)(2), if it proves that its interest in the property was superior to the criminal defendant's, or that it was a bona fide purchaser of the property without reason to know the property was subject to forfeiture. *See* 18 U.S.C. § 1963(*l*)(6). The burden of proof is on the third party. But the pending issue is not whether property forfeited to the government should be returned to an "innocent" purchaser, but whether the $7.8 million the government seeks is even subject to forfeiture. On that issue, the government has the burden of proof.

■ The government maintains that Delco's transfer of the $7.8 million to Security Pacific from May, 1987 to February, 1988 was invalid because, under the relation-back doctrine, the government's title to Delco property dates back to 1973 when Delco's illegal activities began. The government contends that Delco could not legally transfer the $7.8 million to Security Pacific because Delco did not have good title to convey.

This argument reflects a misreading of 18 U.S.C. § 1963(c), which states "all right, title and interest in property *described in subsection (a)* vests in the government upon the commission of the act giving rise to forfeiture * * *." (emphasis added). Section 1963(a) describes the property subject to forfeiture under RICO:

(1) any interest the person has acquired or maintained in violation of RICO;

(2) any interest in; security of; claim against; or property or contractual right of any kind affording a source of influence over an enterprise which the person has established * * * in violation of RICO; and

(3) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection.

The plain meaning of 18 U.S.C. § 1963(c) is that the relation-back doctrine applies only to the categories of property set forth in subsection (a), that is, the proceeds of racketeering activity. *See United States v. A Parcel of Land Known As 92 Buena Vista Avenue,* 937 F.2d 98, 102 (3d Cir.1991). Because the government has not yet proven that the $7.8 million at issue was derived from Delco's racketeering, government title to those funds does not relate back to 1973.

This interpretation of the relation-back doctrine is consistent with *United States v. Monsanto,* 491 U.S. 600, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) and *Caplin & Drysdale v. United States,* 491 U.S. 617, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989). Those cases establish that the government may seize, or restrain the use of, assets subject to forfeiture even if such action deprives a defendant of funds necessary to retain a private attorney. In *Caplin & Drysdale,* the Court determined that the government's forfeiture power extends to funds transferred by a criminal defendant to a law firm as payment for services rendered. In that case, the funds transferred to the third party were the direct proceeds of racketeering. *See* 491 U.S. at 620–21, 109 S.Ct. at 2649–50, 105 L.Ed.2d at 538. Under those circumstances, the cash transfer to the law firm was void *ab initio* because the relation-back doctrine divested the criminal defendant of good title to the funds. *See id.* 491 U.S. at 626–27, 109 S.Ct. at 2653, 105 L.Ed.2d at 542. However, in stating that "the forfeiture statute does not prevent a defendant who has non-forfeitable assets from retaining any attorney of his choosing," *id.* 491 U.S. at 625, 109 S.Ct. at 2652, 105 L.Ed.2d at 541, the Court suggested that assets derived from *legal* activities are not subject to the relation-back doctrine.

This court's interpretation of RICO's forfeiture provisions does not allow parties to "bankroll" racketeers with impunity as the government contends. Following the indictment, the government could have prevented Delco from borrowing from and repaying Security Pacific by obtaining a restraining order or an injunction under 18 U.S.C. § 1963(d). The government did move for a restraining order, but that motion was deemed withdrawn without prejudice after the parties reached an agreement concerning the disposition of Delco's assets. *See supra* at 1513–14. If the government believed that Security Pacific was "bankrolling" illegal activity of Delco during this period, it could have pressed its motion for a restraining order instead of agreeing to the stipulation, or, if the stipulation proved ineffective, renewed its motion for a restraining order. Having pursued neither remedy, it is somewhat ironic for the government to argue that the only way to prevent bankrolling of racketeers is to forfeit the $7.8 million in principal and interest repaid by Delco to Security Pacific in accordance with a valid revolving loan agreement.

On the present record, permitting the government to seize the $7.8 million appears to be inconsistent with the parties' stipulation. The government agreed that, "[o]ther than in the ordinary course Delco will not pledge, sell, transfer, or dispose of any substantial assets of the business, and will immediately notify that [sic] U.S. Attorney of any attempt to execute on any assets." The exchange of funds in accordance with the Agreement between Delco and Security Pacific appears to have been in the ordinary course. It had been in effect since 1977 and was an integral part of Delco's normal operations. Unless the government can prove that Delco's payment of $7.8 million to Security Pacific was not in the ordinary course of business, it is estopped from seizing assets paid to a third party as part of Delco's normal operations.

The government shall inform the court in two weeks whether it has a good faith belief it can prove that the $7.8 million was derived from racketeering activity, in whole or in part, and that Delco's transfer of those funds to Security Pacific was not in the ordinary course of business. If the government chooses to proceed, an evidentiary hearing will be scheduled. Otherwise, the government's application under 18 U.S.C. § 1963(e) will be denied.

C. Security Pacific's Petition For a Hearing to Adjudicate the Validity of its Interest in Property Seized by the Government

Following entry of a forfeiture order, any person asserting an interest in property ordered forfeited may petition the district court for a hearing to adjudicate the validity of its alleged interest in the property. *See* 18 U.S.C. § 1963(*l*)(2). "If, after the hearing, the court determines by a preponderance of the evidence that—

(A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

(B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

the court shall amend the order of forfeiture in accordance with its determination." 18 U.S.C. § 1963(*l*)(6).

Security Pacific seeks the return of approximately $817,000 of Delco accounts receivable seized by the government following the Order of Forfeiture. Security Pacific filed a timely petition in accordance with 18 U.S.C. § 1963(*l*)(2). The court held a hearing to determine when Security Pacific obtained its interest in Delco's accounts receivable for the purpose of resolving whether Security Pacific had cause to believe, at that time, that the property was subject to forfeiture.

■ Section 1963(*l*) applies only to a person with an interest in "property which has been ordered forfeited to the United States." 18 U.S.C. § 1963(*l*)(2). Before the court reaches the question of whether Security Pacific is entitled to the return of the accounts receivable under § 1963(*l*)(6), it is necessary to determine if the property in dispute was actually "ordered forfeited to the United States." If not, the government had no statutory authority to seize the property. *See* 18 U.S.C. § 1963(e). If the property was improperly seized, the government must return the accounts seized regardless of whether Security Pacific can meet the criteria set forth in § 1963(*l*)(6).

The Order of Forfeiture provides for the forfeiture of any proceeds Delco obtained from its racketeering activity, consisting of, but not limited to, $10 million. As explained in Part II.B. of this opinion, the Order of Forfeiture authorized the government to seize two categories of property: 1) property owned by Delco (up to $10 million) and 2) identifiable proceeds of racketeering in the possession of Delco or a third party. *See supra* at 1516–18. There

has been no showing by the government that the seized accounts were proceeds of racketeering. Therefore, the government was authorized to seize the accounts only if they were property of Delco on the date of the Order of Forfeiture; this is determined by the Agreement between Delco and Security Pacific. The Agreement provides that it is to be governed by New York law. *See* Pet. Ex. 1A at ¶ 10. New York has adopted the Uniform Commercial Code ("UCC"). *See* N.Y. UCC § 1–101 to § 13–105.

Delco and Security Pacific, then known as Armstrong Business Credit Corp., entered into the Agreement in 1977. Security Pacific was granted a security interest in all Delco's accounts receivable, "whether now existing or hereafter arising," *id.* at ¶ 1, all present and after-acquired inventory, Pet. Ex. 1B at ¶ 1, and all owned or after-acquired machinery and equipment, Pet. Ex. 1C at ¶ 1. *See* N.Y. UCC § 9–201 ("a security agreement is effective according to its terms").

The original Agreement had an initial term of two years and was "automatically renewed for successive periods of one year unless terminated by either party on the anniversary of its effective date." *See* Pet. Ex. 1A. This clause had the effect of terminating the security interest created in 1977 after two years and recreating it each year upon each automatic renewal. This process of termination and recreation continued under the 1980, 1982, and 1983 amendments to the Agreement. *See* Pet. Exs. 1D, 1E, 1F. Security Pacific's security interest in the accounts receivable at issue was created on the date of the last automatic renewal, May 19, 1987; it does not date back to 1977.

On May 19, 1987, the security interest "attached" to Delco's existing and after-acquired accounts receivable. A security interest attaches if:

1) the collateral is in the possession of the secured party pursuant to the agreement, or the debtor has signed a security agreement which contains a description of the collateral;

2) value has been given;

3) the debtor has rights in the collateral. N.Y. UCC § 9–203(1). All three of these criteria were satisfied on May 19, 1987. The Agreement described the collateral with specificity (then existing and after-acquired accounts receivable, inventory, and machinery), Delco obtained value in exchange for the security interest (continuance of its line of credit), and Delco has rights in the collateral, *see* N.Y. UCC § 9–204(1) (permitting the use of after-acquired property as collateral).

Delco's conviction on racketeering and forfeiture charges in February, 1988, did not retroactively affect the security interest in the accounts receivable. Had the accounts been derived from racketeering activity, title to them would have vested to the government in 1973, when Delco's illegal activity began, and a security interest in them could not have been created in 1987. Unless the government can prove that the accounts receivable at issue were derived from Delco's illegal conduct, Delco held good title to the accounts receivable on May 19, 1987 and conveyed a valid security interest.[1]

Under the Agreement, a default occurred when Delco "fail[ed] to make payment of any of the Obligations when required * * *." *Ibid;* Delco became incapable of fulfilling its obligations under the Agreement when the Order of Forfeiture was entered and Delco lost control of its assets. Delco defaulted on the Agreement on February 26, 1988.

---

**1.** Because Security Pacific is the only creditor claiming an interest in the accounts receivable, it does not matter whether the security interest was perfected. Nonetheless, Security Pacific did perfect its security interest by filing financing statements with the Office of the Secretary of State of the Commonwealth of Pennsylvania and the Prothonotary of Bucks County in 1977.

*See* Pet. Ex. 2A at 1, 4; Ex. 2B at 1, 4. Those statements were amended on February 22, 1983 to record that the name of SP Business Credit Corp. was changed to Security Pacific. Pet. Ex. 2A at 3, 5; Ex. 2B at 3, 5. Continuation statements were filed with the Secretary of State on March 11, 1987 and with the Prothonotary of Bucks County on January 8, 1987.

The Agreement provided that upon default, Delco would repay all outstanding loans immediately. Security Pacific was also entitled to exercise all the rights and remedies of a secured creditor. *See* Pet. Ex. 1A ¶ 9; N.Y. UCC § 9–501(2). Under the UCC, a secured creditor may take possession of the collateral upon default without judicial process. *See* N.Y. UCC § 9–503. Furthermore, a lender owning a security interest in accounts receivable may, upon default by the creditor, notify the account debtor to make payment directly to the secured party. *See* N.Y. UCC § 9–502(1); *Manufacturers & Traders Trust Co. v. Pro–Mation, Inc.*, 115 A.D.2d 976, 497 N.Y.S.2d 541, 542 (1985).

On the date the Order of Forfeiture caused Delco to default on the Agreement, Delco owed Security Pacific $817,802.05, *see* Pet. Ex. 4, and lost all its property interest in the accounts receivable. Under the UCC, Security Pacific was entitled to take possession of the accounts receivable immediately and notify all Delco's debtors to make payments directly to Security Pacific.

The government could not seize those accounts as part of the *in personam* forfeiture against Delco because they were no longer Delco's property. Unless the Government can prove that the accounts were derived from racketeering, and therefore subject to forfeiture under the relation-back doctrine, Security Pacific is entitled to reimbursement of $817,802.05.

This result also appears to be consistent with the stipulation of the parties concerning disposition of Delco assets. Rather than pressing its motion for a restraining order (the entry of which would have closed Delco), the government agreed that Delco could continue transactions in the ordinary course of business. Accordingly, the Agreement continued to operate as it had since 1977; Security Pacific provided funds to Delco as Delco made periodic repayments of principal and interest. Delco's conveyance of a security interest in the accounts receivable appears to have been in the ordinary course. Having permitted Delco to continue business operations fol-

lowing the indictment, the government cannot now seek forfeiture of the collateral used to secure loans that provided Delco capital to remain in operation. Unless the government can prove that the granting of a security interest in accounts receivable was not in the ordinary course of business, it is estopped from attacking the validity of that security interest.

The government shall inform the court in two weeks whether it has a good faith belief it can prove that the accounts receivable at issue were derived from Delco's racketeering activity and the granting of a security interest was not in the ordinary course of business. If the government chooses to proceed, a hearing will be scheduled. If not, Security Pacific's motion to return the property will be granted.

In the event that Security Pacific's motion is granted, and the parties are unable to determine the amount of money and interest, if any, owed to Security Pacific, a briefing schedule will be set and, if necessary, a hearing scheduled.