UNITED STATES of America,

v.

James IDA, et al., Defendants.

James Hickey, Petitioner.

No. S1 96 CRIM. 430(LAK).

United States District Court,
S.D. New York.

July 27, 1998.

Ephraim Savitt, New York, NY, for Petitioner.

Barbara Ward, Asst. U.S. Atty., Mary Jo White, U.S. Atty., for U.S.

## MEMORANDUM OPINION

KAPLAN, District Judge.

The jury in the criminal trial found the defendant James Ida guilty of violating the Racketeer Influenced and Corrupt Organizations Act, better known as RICO, among other offenses. It further determined that Ida had an interest in certain real property and appurtenances located in Katonah which

is in the Town of Bedford in Westchester County, New York. That property is owned of record by the petitioner in this proceeding, James Hickey. The jury further found that all of Ida's right, title and interest in the Katonah property constituted or was derived from proceeds that Ida obtained from the racketeering activity of which he was convicted. In consequence, the Court entered an order on the jury verdict forfeiting the Katonah property to the United States.[1] The Court now has before it the petition of James Hickey, brought under 18 U.S.C. § 1963(*l*), to determine that he owns and has the unencumbered right to possession of the Katonah property. The issue is whether Hickey has proved by a preponderance of the evidence that the property, colloquially stated, in fact belongs to him. These are the Court's findings following an evidentiary hearing. Also before the Court is the government's post-hearing application to reopen the record to take additional evidence.

### Facts

Mr. Hickey is a businessman who lives and works in Westchester County. He has interests in several waste hauling companies and owns some real estate. According to tax returns and other materials in evidence, he is a person of quite considerable means. He bought the Katonah property in January 1993 for $900,000, which he paid from bank or investment accounts in his own name in which there were more than ample funds to cover the cost of the purchase. Legal title to the property has been in Mr. Hickey's name at all times relevant to the petition. Moreover, other documents relating to the property, including insurance policies, reflect as a matter of record that Mr. Hickey is the owner. The real question is whether and to what extent Hickey bought and holds title to the property as a front for Ida who, at least prior to the trial, was the *consigliere* of the Genovese organized crime family.

The evidence demonstrates, as the jury at least implicitly found in the criminal trial, that the property was bought for and used exclusively by Ida and his family. Hickey's interest in the property began in late 1992,

and it is important to focus on his personal circumstances at that time.

Hickey then only recently had been divorced from his wife of many years. He had moved in with another woman, now Elizabeth Hickey, whom he later married in April 1993. He first became aware of the Katonah property when he and Mr. Ida visited a Bedford real estate broker named Cole. Hickey told the broker that he was looking for a property on which he could keep his horses. Either he or Ida indicated to Mr. Cole that Ida was Hickey's "horse man." This was false. as Hickey did not then and never subsequently has had any horses. Ida, on the other hand, owned a horse which he kept on Staten Island. Moreover, when Ida subsequently was arrested, he was found in possession of membership cards made out in his name indicating his membership in the American Quarter Horse Association and the National Cutting Horse Association, and it is undisputed that Ida, subsequent to Hickey's purchase of the property, maintained horses of his own on the property.

Mr. Cole showed Hickey and Ida the Katonah property which is a very secluded and remote eleven-acre parcel with a house and a barn. They visited the property together on a number of occasions. Mr. Hickey, on one or more of those visits, indicated to one or possibly both real estate brokers involved that he soon was to be remarried, which was accurate, and that children would be moving on to the property. At that time Mr. Ida had young children. Mr. Hickey did not. Mr. Hickey ultimately bought the property. The closing was in January 1993.

Soon thereafter, Mr. Hickey commissioned substantial renovations at considerable expense. At least as a matter of the immediate paper trail, there is no doubt that he paid for the renovations himself. It was Mr. Ida, however, who moved in not long after the closing. Mr. Ida was followed soon thereafter by his wife and the young children, and the Ida family before long was well ensconced on the property where, as indicated, they kept a number of horses. They ar-

---

**1.** Certain aspects of the order have been stayed by the Court of Appeals pending disposition of

the appeal from the judgment of conviction against Ida.

ranged for the care of the animals by a local veterinarian. They shooed trespassers away, and they exercised dominion and control over the premises in various ways.

Mr. Hickey's explanation for Ida's presence on the property is this: He says that he bought the house as a residence for himself and his wife-to-be or, if that did not work out, as an investment. He says that he discarded the idea of living there with Elizabeth only some time after the April 1993 wedding, when Elizabeth told Mr. Hickey that she didn't want to live in such an secluded location. In the meantime, according to Hickey, Hickey was doing very substantial renovations. Mr. Ida was looking for a place to live, and Hickey decided that it would be a good idea to have someone on the property to protect his investment. He therefore says that, in substance, he invited Ida to house sit and allowed Ida and his family to remain without payment of rent for the intervening four and a half years. The Court does not find this story persuasive.

Mr. Hickey acknowledged that the present Mrs. Hickey never saw the house before Hickey bought it. He said that he installed a new kitchen in the house without consulting her. Either of those circumstances would be extraordinarily unlikely if, in fact, Mr. Hickey intended to occupy the property with her. Furthermore, Mr. Hickey's statement to the broker that there would be children on the property was true: Ida's children were the children he expected to be on the property. Neither he nor the current Mrs. Hickey had any children who would have resided with them even if they had moved in. Nor is the Court persuaded by the investment theory.

Furthermore, it has to be borne in mind that there is every reason to suppose that this house was bought to meet Ida's, and not Hickey's, specific requirements. It was Ida who wanted a property with facilities for horses, not Hickey. It was Ida, not the current Mrs. Hickey, who went to see the property with Mr. Hickey before it was purchased. It was Ida who was interested in nature and remote areas, owning a log home on a large parcel in the middle of the Adirondack State Park, describing himself to others as a big game hunter, and bragging that he had shot a mountain lion and of taking expensive trips to Alaska in the hope of killing a large grizzly bear. His background and interests are far more consistent than Mr. Hickey's, to the extent the latter are of record, with interest in a property of this nature.

It is significant also, although certainly not dispositive, that after buying the property Mr. Hickey caused the installation of a very elaborate security system that included a number of remotely operated color television cameras to monitor the property, and he waged a lengthy court battle and paid a $100,000 settlement to the Westchester Land Trust to secure, perhaps among other things, the right to maintain a remotely operated security gate on a portion of the access road to the property that ran through land owned by the trust. While the isolated location of the house might have caused any homeowner to take security measures, the likelihood that the real motive for that installation was to protect Ida's personal security from the threats accompanying a life in the world of organized crime is considerably greater than the likelihood that Hickey would have installed such an expensive and comprehensive system in a house that he never intended to occupy.

The government's contention that Mr. Hickey was simply a front for Ida's ownership of the Katonah property draws strength from other aspects of the relationship between Hickey and Ida and the improbability of Hickey's account of that relationship. According to Hickey, he first met Ida as a result of their mutual enthusiasm for motorcycles. Mr. Hickey was in the habit of riding his motorcycle on weekends, and he said he encountered Mr. Ida for the first time in 1991 or 1992 at a biker hang out in Connecticut on one of those occasions. For a period of months, they saw each other essentially by chance on Sundays when they both happened to be at that particular location along with a lot of other motorcyclists. They became friends and they gradually began to see more of one another. According to Mr. Hickey, this growing relationship or closeness was marked, among other things, by the two of them, together with another group of people,

all of whom appear to have been members of Ida's crew in the Genovese family, taking a long motorcycle trip to South Dakota.

In time, according to Mr. Hickey, Ida told him that he wanted to buy a house in Putnam or Dutchess County in the $300,000 to $400,-000 price range and that he hoped to get a mortgage that would support such a purchase. Mr. Hickey told Ida that he thought that was unlikely because Ida had told him that he was employed as a truck mechanic and made about $30,000 a year. But Mr. Ida explained that he wanted to find a business to go into in the hopes that would enable him to get a mortgage.

Throughout the period of the growing relationship between Hickey and Ida, as Mr. Hickey tells the story, Mr. Hickey never knew where Ida lived, never knew where he worked, and never visited Ida's home. Ida never was in Mr. Hickey's home. The two met only at diners or other such establishments in Westchester. Mr. Hickey had no idea what brought Mr. Ida to Westchester, and he had no way of reaching Mr. Ida except to beep him by electronic pager. Nevertheless, when Mr. Ida expressed the desire to go into business, Mr. Hickey lent him an enormous amount of money, initially a quarter of a million dollars and eventually $1.1 million, for that purpose. To suggest that Mr. Ida, if he was what he purported to be, was not a good credit risk on the merits at that time would be a vast understatement, even for a person with Mr. Hickey's means.

The money seems to have gone into a company called Interstate Petroleum Products, Inc., otherwise known as IPPI, which was in the petroleum business. It was incorporated by Ida in the fall of 1993. Ida was listed as its president and sole stockholder. The business was financed by Hickey's loans to Ida which Ida in turn loaned to the corporation. Hickey's loans to Ida were secured by Ida's stock in IPPI. Ida's loan to IPPI was secured by IPPI's tangible assets, which consisted of trucks and office furniture, perhaps among other things. According to an accountant who testified in the criminal trial, whenever Ida got a check from IPPI, he

wrote a personal check to Mr. Hickey in payment of interest on the loans.

In the Court's view, the economic reality of the IPPI situation is plain enough. The entire capital at risk in the business was Hickey's. Ida provided no capital. Indeed there is no reason to believe that Ida ever did any significant work for IPPI. The company even occupied Hickey-owned real estate rent free. Its purpose, the Court is persuaded, was to provide Ida with an arguably legitimate source of income that would deflect any inquiry concerning the lifestyle that Ida was in the process of adopting in light of his marriage in July 1992 to Irene Portelli, a much younger woman with young children.

The fact that Mr. Hickey and IPPI essentially were a façade for the convenience of Ida is corroborated by an intercepted telephone conversation between Hickey and Ida that took place on December 15, 1994.[2] In that conversation, Hickey told Ida that he had received a call from Exxon while at IPPI's office and that Hickey told the man from Exxon, who was anxious to get an IPPI financial statement in connection with IPPI's desire to start handling a particular Exxon product, that he, Hickey, in fact was Ida, who was listed as the president of IPPI. Hickey and Ida joked about the fact that if Ida ever were to meet the man from Exxon who had called, the caller was, in Hickey's words, "gonna think" Ida "was some kind of knucklehead running a business." They discussed also the fact that IPPI had no financial statement but that Hickey would nevertheless put something together to send to Exxon.

The inferences to be drawn from that conversation, particularly taken in the context of all of the evidence, are several. One obvious inference, and one that the Court draws, is that Ida was not a "knuckle head" or otherwise running the business. He was an absentee. The business was a front. Second, Hickey was perfectly prepared to pass himself off as Ida when that was required. Third, the two were jointly engaged in deception concerning the IPPI operation, what it was, and who was running it.

---

**2.** GX 612 T–4.

There are still further indications, not all of which need be detailed here, that the relationship between Hickey and Ida simply is not remotely that which Mr. Hickey described in this hearing. Mr. Hickey in a very substantial way has been supporting the Ida family since Mr. Ida went to jail. Mrs. Ida and her children still were living on the property at the time of the hearing. Although Mr. Hickey called his notes and took possession of all the IPPI stock, he continued Mrs. Ida on the payroll. He continued to employ on the IPPI payroll a man named Angelo, who was one of Ida's men and who helped Ida with the Katonah property when Ida was in residence. There is no persuasive evidence here that either Angelo or Mrs. Ida did anything of value for Mr. Hickey or for IPPI. The inference the Court draws is that Mr. Hickey has been supporting the family for the benefit of Mr. Ida.

Further, there was a good deal of evidence at the criminal trial to the effect that Mr. Ida often went to considerable lengths to conceal his activities and, at least in some instances, to conceal his economic interest in assets. He paid cash for major purchases including a boat. He used cars and cellular telephones that were owned of record by others. Until IPPI was formed and Ida nominally placed on its payroll, he listed no occupation on his federal income tax returns. So the notion that Mr. Ida would use a front to hold nominal ownership of a house of which he was the true owner certainly is not far-fetched.

Nor did the Court find Mr. Hickey a very persuasive witness. The Court has alluded already to the improbability of some of his testimony, but there is another point of some importance—the affidavit filed by Mr. Hickey in the litigation with the Westchester Land Trust.[3] That was a lawsuit having to do with easements on or affecting the Katonah property and the adjacent land owned by the trust. In an effort to defeat a motion for summary judgment by the trust, Mr. Hickey swore to an affidavit that is riddled with false statements. He sought to portray himself as a beleaguered and privacy-loving homeowner. He swore that he lived on the Kato-

nah property. He swore that he owned four horses stabled on the property. In fact he did not live there and he did not own any horses, whether on the property or anywhere else.

Mr. Hickey tried to minimize the significance of these falsehoods by claiming that he trusted his lawyer to prepare the affidavit and did not pay close attention to it. The Court accepts that explanation, but only to a point. Mr. Hickey, as he said, is not a "detail man." There are clients, of which he probably is one, who are not as careful as they should be in reading legal documents prepared for them. But, in the last analysis, Mr. Hickey admitted on the stand that he knew when he signed that affidavit at least that it said he lived on the property and that he owned and maintained horses on the property when in fact he did neither. At least to that extent, he thus knowingly submitted a false affidavit to the judge in Westchester County for the purpose of securing an advantage in litigation. And were there any doubt about that, it would be eliminated entirely by Government's Exhibits 622T and 622R, which are a tape and a transcript of an intercepted conversation between Mr. Hickey and Mr. Ida that occurred only a few days after the affidavit was signed. In the course of that conversation, Mr. Hickey read to Mr. Ida from newspaper coverage of the Westchester Land Trust lawsuit. In the passage that Mr. Hickey read to Mr. Ida on the telephone, the article reported that Mr. Hickey had submitted an affidavit in which he stated that he lived on the property. In consequence, even if Mr. Hickey overlooked that part of the affidavit when he signed it in January, he certainly knew from reading it in the newspaper on or about February 1 that is what it said, and he knew it was false.

### Discussion

The forfeiture provision of the Racketeering Influenced and Corrupt Organizations Act[4] that governs here provides in relevant part as follows:

"If, after a hearing, the court determines that a petitioner [in Hickey's position] has a legal right, title, or interest in the prop-

---

**3.** GX 2743.

**4.** 18 U.S.C. § 1961 *et seq.*

erty, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section ... the court shall amend the order of forfeiture in accordance with its determination." [5]

Thus, in order for Hickey to succeed on his petition, he must establish by a preponderance of the evidence that he has a legal right, title or interest in the Katonah property and that his interest renders the order of forfeiture invalid in whole or in part because his interest was superior to Ida's at the relevant time.[6]

*Standing*

Hickey is met at the outset by the government's argument that he is merely a "straw" who holds legal title to property which in all other respects belongs to Ida and therefore lacks standing to proceed here. In order to evaluate the government's contention, it is helpful to place RICO forfeitures and the proceedings by which they are determined in context.

■ The statute provides that assets derived from racketeering activities are subject to forfeiture to the United States. It further provides that the government's claim to such assets is determined by the jury in the criminal case. As potential third party claimants are not parties to the criminal case, however, they cannot be bound by a verdict of forfeiture. The effect of a verdict of forfeiture therefore is simply to put the government into the shoes of the criminal defendant. It

succeeds to whatever interest, if any, that the defendant had in the property.[7]

■ As initially enacted, RICO contained no mechanism for adjudicating third party claims to property held subject to forfeiture. In consequence, Congress in 1984 amended the statute to establish a procedure for giving notice to prospective claimants and adjudicating their claims to property found forfeitable in criminal cases.[8] Recognizing that the government necessarily will have proved beyond a reasonable doubt that the criminal defendant had an interest in the property, but bearing in mind also that third-party claimants will have had no opportunity to have been heard on that issue, Congress placed the burden of proof of the claimant's interest in the property and its superiority to any interest of the defendant on the claimant, albeit by a preponderance of the evidence.[9] Hence, a third party claimant in circumstances such as this cannot prevail unless it establishes by a preponderance of the evidence that it holds a right, title or interest in the property and that its interest is superior to that of the defendant.

Following the enactment and increased use of the RICO and comparable criminal forfeiture statutes, courts became increasingly troubled with the use by criminals of "straws"—nominees in whose names they placed legal title to potentially forfeitable assets in order to conceal their financial activities or avoid forfeiture. Bearing in mind the fact that Article III of the Constitution extends the judicial power only to "cases" and "controversies" between parties with real and substantial interests in the outcome, many courts quite properly have held that "straws" lack such interests and therefore lack standing to proceed with third-party claims.[10] Moreover, numerous cases hold

---

5. 18 U.S.C. § 1963(*l*)(6).

6. *United States v. Schwimmer,* 968 F.2d 1570, 1580 (2d Cir.1992).

7. *See United States v. Lavin,* 942 F.2d 177, 185 (3d Cir.1991).

8. *E.g.,* S. REP. No. 98–225, 98th Cong., 2d Sess. 207–09 (1984).

9. *Id.* at 209. As the statute does not define the language referring to interests in property, the

extent of the claimant's interest depends upon state law.

10. *See, e.g., United States v. Vacant Land Located at 10th St. and Challenger Way,* 15 F.3d 128, 130 (9th Cir.1993); *United States v. A Single Family Residence and Real Property Located at 900 Rio Vista Blvd.,* 803 F.2d 625, 630 (11th Cir.1986); *United States v. The Premises and Real Property at 500 Delaware St.,* 868 F.Supp. 513, 518 (W.D.N.Y.1994), *aff'd,* 113 F.3d 310 (2d Cir. 1997).

that once the government makes a *prima facie* showing that a third-party claimant is a "straw," the claimant must "present evidence of dominion and control or other indicia of true ownership" [11] or have its claim dismissed for lack of standing. And it is this line of authority upon which the government relies.

This case is quite different from any of the cases relied upon by the government, all of which were clear-cut attempts at circumvention in which the third-party claimant, for example, took a gratuitous transfer of the subject property from the criminal defendant.[12] There was no such transfer here. The government, however, contends that Hickey has no more interest in the property than the straws in the cases upon which it relies because he must have provided the property to Ida in exchange for illegal consideration from Ida. In a nutshell, it argues that the Genovese family long has exerted substantial influence over the waste hauling business in Westchester County, that Hickey could not have operated successfully in that industry without the patronage of organized crime, and that the logical inference is that Ida provided protection or other illegal services for Hickey's benefit in exchange for Hickey's providing Ida with the Katonah property.

■ While the government's theory has considerable appeal to anyone who has read newspapers in the New York area regularly over the years, its validity is not self evident. This matter must be decided on the evidence presented in this proceeding and the criminal trial, not on impressions gleaned from newspaper reports. Hence, the dispositive question is whether Hickey's demonstration that he paid for the property with his personal funds and to some extent exercised dominion over the property is sufficient to demonstrate that he has a real and substantial interest in the property and thus standing to contest the forfeiture. To state the question is to answer it. The Court sees no substantial basis for the contention that someone who has invested over $1 million of his own funds in a piece of real estate and taken an active hand in renovating it lacks sufficient interest to bring his claim to the property within the constitutional "case" or "controversy" requirement.

## The Merits

■ Although Hickey has standing, he cannot prevail here unless he has proved, by a preponderance of the evidence, that he has an interest in the property superior to Ida's during the relevant period.[13] This he has not done.

The relationship between Ida and Hickey remains shrouded in mystery. There are substantial indications that Hickey was involved in or, at least, aided and abetted criminal activity by Ida. On one occasion, he clearly warned Ida to stay away from a location at which a search warrant had just been executed. His actions with respect to IPPI appear to have been designed to afford an apparently legitimate front for Ida—an ostensible source of legitimate income sufficient to justify Ida's desired life style and to provide Ida with a plausible basis for denying that he supported his life style by illicit means. The recorded conversations between Hickey and Ida—especially those pertaining to the Exxon inquiry regarding IPPI and the Westchester Land Trust lawsuit—persuasively suggest mutual involvement in illicit activities. Nor do these indications of skulduggery stand alone. There is, after all, the sheer improbability of Hickey's account of the reasons for his having spent over $1 million to provide Ida and his family with a country estate on which to live and for his having supported Ida's family after Ida's arrest.

Courts often are called upon to make close judgments as to the veracity of versions of events, often competing versions of the same events. Ordinarily, these visions of reality are plausible and have an air of verisimilitude, even if some of them ultimately are not fully persuasive or, indeed, persuasive in

---

**11.** *United States v. 526 Liscum Drive, Dayton, Montgomery County, Ohio,* 866 F.2d 213, 217 (6th Cir.1989).

**12.** Note 11, *infra.*

**13.** *E.g.,* Steven L. Kessler, Civil and Criminal Forfeiture § 4.02[3][n], at 4–52 (1997).

their most important details. This case, however, is not readily so characterized. The overall picture that emerges here is one of calculated deception, the object of which is to suspend a fig leaf between the gaze of the Court and the grim realities of Hickey's relationship with Ida, whatever precisely that is. As Hickey has offered no credible explanation of the arrangement between himself and Ida, the Court finds that Hickey has failed to demonstrate, by a preponderance of the evidence, that his interest in the property was superior to Ida's right, title or interest at the time of the commission of the acts which gave rise to the forfeiture.

*Conclusion*

For the foregoing reasons, Hickey's petition to amend the order of forfeiture is denied in all respects. The government's application to reopen the hearing record is denied as moot.

SO ORDERED.