**UNITED STATES of America,
Plaintiff,**

**v.**

**Carmine AGNELLO, Steven Scala, Mark Lomonaco, Joseph Burger, Debra Decarlo, Michael Agnello, John Sowalski and New York Shredding Corporation, Defendants.**

**No. 00 CR 205(NG).**

United States District Court,
E.D. New York.

Oct. 29, 2004.

**362**

Charles E. Graf, John Nields, Jr.—
Washington, DC, (Both of Howrey, Simon,
Arnold, & White, LLP), for plaintiff.

Andrew M. Genser–USAO, Brideet M.
Rhode, USAO, Brooklyn, NY, for defendant.

## OPINION AND ORDER

GERSHON, District Judge.

Supervision of all ancillary proceedings relating to the Consent Order of Forfeiture ("Consent Order") approved by the court on September 7, 2001 was referred to Magistrate Judge Robert M. Levy. All dispositive issues relating to the Consent Order were also referred to Judge Levy for report and recommendation. Caterpillar World Trading Corporation ("CWTC") moved to amend the Consent Order to exclude certain property that allegedly belongs to it, pursuant to 18 U.S.C. § 1963(*l*). Following an evidentiary hearing, Judge Levy has recommended that the application of CWTC be granted in part and denied in part. CWTC has filed objections to that part of the report which recommends denial of its application. The government, while opposing CWTC's application before Judge Levy, has filed no objections to his report. Although counsel for defendant Agnello requested, and was granted, additional time to file papers relating to the Report and Recommendation, no papers have been filed with the court

by Agnello. CWTC's objections will be reviewed *de novo*.

■ The background and facts, ably set forth by Judge Levy, are adopted by the court and will not be repeated. As Judge Levy found, before CWTC can obtain an amendment to the Consent Order, it must assert, among other things, a "legal right, title or interest in the property" that has been seized by the government that was vested in the petitioner rather than the defendant, or was superior to any right, title or interest of the defendant, at the time the defendant committed the acts giving rise to the forfeiture. 18 U.S.C. § 1963(*l*)(6)(A); *United States v. Schwimmer*, 968 F.2d 1570, 1580 (2d Cir.1992). An interest "in" property, for the purposes of the forfeiture statute, must be an interest in a particular, specific asset, as opposed to a general interest in an entire forfeited estate or account. *United States v. Ribadeneira*, 105 F.3d 833, 836 (2d Cir. 1997).

### A. The Six Machines Sold by CWTC to Defendant New York Shredding

Initially, the government agreed that five of the six machines which CWTC sold to New York Shredding should be excluded from the Consent Order, but contested CWTC's rights relating to a sixth machine, Material Handler Model No. 320MH. However, the government has filed no objections to Judge Levy's recommendation that the Consent Order be amended to exclude that machine or the proceeds thereof. Therefore, adopting Judge Levy's well-reasoned conclusions as to all six machines, it is ordered that CWTC has a superior security interest in all six machines and that it is due both the outstanding debt on all six machines plus interest on the outstanding debt, as per the contract, up to the date of the final judgment

in this case. The Consent Order must be so amended.

I turn now to the principal issues in dispute.

### B. Expenses and Advance Payments

█ CWTC objects to Judge Levy's conclusion that New York Shredding's indebtedness to it for expenses and advance payments is not secured and therefore is not properly excluded from the Consent Order. Upon review of CWTC's various arguments, I conclude that Judge Levy was entirely correct in his analysis and that CWTC's arguments are without merit. In essence, CWTC must establish a secured interest in the expenses and advance payments. As Judge Levy concluded, it has established only that it is a general creditor of New York Shredding with respect to those expenses and payments. Put another way, CWTC has not established that its security interest in the six machines extended to expenses and advance payments.

CWTC's argument that it does so extend depends on the following clause, which appears in the contract between CWTC and Shredder:

> SHREDDER hereby grants to [CWTC] a continuing security interest in MACHINES including: attachments, accessories, optional features installed or not, substitutions, replacements, additions, and proceeds of all of the foregoing to secure payment *of SHREDDER"S indebtedness.*

Judge Levy analyzed this clause as a "dragnet clause," which he held had to be sufficiently clear and unambiguous to provide sufficient notice to subsequent creditors. Judge Levy then concluded that the clause was not sufficiently clear and unambiguous to create a security interest in CWTC covering not only New York Shredding's indebtedness on the purchase of the machines themselves but also, as CWTC claims, its indebtedness for expenses and advance payments. CWTC's objections to these conclusions are rejected, and Judge Levy's comprehensive analysis of the applicable law and its application to the facts at bar is adopted.

CWTC argues, alternatively, that, having found the language of the dragnet clause ambiguous, Judge Levy should have relied upon extrinsic evidence establishing that the parties to the contract containing the dragnet clause understood that the Caterpillar machines would secure all of New York Shredding's indebtedness and not just the principal and interest owed for the purchase of the machines. This argument misses the point of *In Re Riss Tanning Corp.,* 468 F.2d 1211 (2d Cir.1972), upon which Judge Levy properly relied. The reason a dragnet clause must be clear and unambiguous is to assure that it will "be effective and sufficient to put a subsequent creditor on notice." *Riss,* 468 F.2d at 1213. The subsequent creditor, relying on the perfected security agreement containing a dragnet clause, has no access to the parties' extrinsic evidence; it must rely solely on the language of the filed agreement. It is for that reason that the language of a dragnet clause must be clear and unambiguous; only if it is, can it be relied upon to give a secured party rights superior to a subsequent creditor.

Finally, CWTC's attempt to transform the advance payments into debt constituting payments of principal due and owing on the machines appears to be based solely upon a criticism of its own accounting methods. The argument is without any basis in law and is rejected.

### C. Metropolitan Recycling Machine Debt

CWTC also objects to Judge Levy's conclusion that the Consent Order should not

be amended to exclude New York Shredding's debt arising from New York Shredding's guarantee of Metropolitan Recyling's purchase of two machines from CWTC. CWTC does not dispute that the machines securing the debt were in Metropolitan Recycling's possession at the time of the forfeiture and were not part of the government's forfeiture. It argues, nonetheless, that, pursuant to N.Y.U.C.C. § 9–203(f), it has a security interest in the guarantee made by New York Shredding and that the proceeds of the sale of the six machines which New York Shredding possessed and forfeited to the government can be used to satisfy this secured obligation.

First, any security interest in the guarantee is limited to the value of the collateral—the two machines. *See* Comment 8 to N.Y. U.C.C. § 9–203 ("Implicit in subsection (f) is the principle that the secured party's interest in a supporting obligation extends to the supporting obligation only to the extent that it supports the collateral in which the secured party has a security interest."). But even a secured interest in that amount does not constitute an "interest" in a particular, specific asset within the seizure; rather, it constitutes a general interest in the entire amount forfeited. Thus, even if CWTC could assert a security interest in the supporting obligation (the guarantee) without first attempting to foreclose on the two machines in the hands of Metropolitan Recycling, which constitute the collateral, an issue the court need not reach, that security interest would not meet the requirements of the forfeiture statute for an amendment to the Consent Order.

▪ Second, CWTC argues that it has a security interest in "additional collateral" pledged by New York Shredding in support of Metropolitan Recycling's obligations to CWTC. Specifically, CWTC asserts an interest in certain accounts receivable that were payable by CWTC to New York Shredding under the terms of the agreement they entered into prior to the Metropolitan Recycling deal. Since these accounts receivable payable by CWTC were not among the assets forfeited to the government, they cannot serve as the basis for an amendment to the Consent Order. A party's interest in property must be an interest in a particular, specific asset that has been ordered forfeited to the government to warrant relief under 18 U.S.C. § 1963(*l*)(6)(A). *Ribadeneira*, 105 F.3d at 836.

## D. $1,254,304.88 Collected Subsequent to Arrests

Judge Levy rejected the government's claim seeking forfeiture of this sum, which CWTC acknowledges it collected on behalf of New York Shredding subsequent to the defendants' arrests in January 2001. No objection having been raised to Judge Levy's conclusions with respect to this sum, I adopt Judge Levy's recommendation and direct that CWTC is permitted to keep the money collected subsequent to the arrests, to the extent that it constitutes reimbursements to CWTC for advances, expenses and monthly payments due at the time, and that any overage be turned over to the defendants.

## E. The Global Mills Escrow

CWTC seeks an order releasing to it the funds ($193,994.33 and accruing interest) which Global Mills, a scrap broker, placed in escrow pursuant to an order of Judge Levy. CWTC claims that these funds would have been received by CWTC in the ordinary course of business and are not forfeitable. Since no party has opposed this claim, it will be accepted by the court.

## CONCLUSION

Judge Levy's Report and Recommendation is adopted in its entirety. CWTC is

directed to prepare an Order amending the Consent Order in conformity with the conclusions set forth above and to submit to the court whatever other documents may be necessary to effectuate this order. These documents should be submitted on ten days' notice to all parties to the Consent Order.

**SO ORDERED.**

*REPORT AND RECOMMENDATION*

LEVY, United States Magistrate Judge.

By order dated October 11, 2001, the Honorable Nina Gershon, United States District Judge, generally referred to me for supervision, hearings, and Report and Recommendation all ancillary proceedings related to the Consent Order of Forfeiture ("Consent Order") approved by the court on September 7, 2001. (*See* Order, dated Oct. 11, 2001.) Caterpillar World Trading Corporation ("CWTC") now moves to amend the Consent Order pursuant to 18 U.S.C. § 1963(1) to exclude property that allegedly belongs to it. For the reasons set forth below, I respectfully recommend that the application be granted in part and denied in part.

*BACKGROUND AND FACTS*

On July 22, 1997, CWTC entered into an agreement with New York Shredding Corporation ("NYSC") to finance NYSC's purchase of four Caterpillar machines.[1] (*See* Appendix to CWTC's Proposed Findings of Fact and Conclusions of Law ("CX"), at 1.) CWTC's security interests in the four machines were perfected by filing financing statements with the New York Secretary of State in December 1997. (*See* CX–

27, CX–28, CX–32.) The original 1997 agreement was amended on March 23, 1998 to include financing for NYSC's purchase of a fifth Caterpillar machine, a material handler, model no. 320 MH, for $230,000 plus interest. (*See* CX–3.) CWTC's security interest in this additional machine was perfected in October 2001. (*See* CX–33.) On April 13, 1998, the parties amended their agreement again, whereby CWTC financed approximately $725,000 plus interest of NYSC's purchase of an American Pulverizer shredding machine. (*See* CX–4.) CWTC's security interest in the Pulverizer machine was perfected in May 1998. (*See* CX–29, CX–30, CX–37.)

In order to pay off its debt, NYSC agreed to a barter-like arrangement or countertrade agreement with CWTC whereby NYSC shipped scrap metal to customers located by CWTC. (*See* CX 1 ¶¶ 11–12.) CWTC would locate buyers for scrap metal who would forward a purchase order to CWTC. (*Id.* ¶¶ 12, 15; Statement of Christine Demmin, dated May 30, 2002 ("Demmin Statement"), ¶ 13.) CWTC would then forward the purchase order to NYSC and NYSC would ship the scrap metal directly to the customer by railcar. (CX 1 ¶ 12; Demmin Statement ¶ 13.) CWTC paid the charges for the railcar, waste disposal, and any other related expenses on NYSC's behalf. (*See* Demmin Statement ¶¶ 15, 16.) Customers forwarded payment for the shipments directly to CWTC, which would then deduct the costs of the railcar, waste disposal, other expenses, and monthly finance payments on the six machines. (*See* CX 1 ¶¶ 13–14; Demmin Statement ¶¶ 14, 17.) Any remaining money was then sent to NYSC.

---

1. The four Caterpillar machines included in the original agreement were (1) a material handler, model no. 350 MH for $435,000 plus interest; (2) a material handler, model no. 325 MH for $311,300 plus interest; (3) a wheel loader, model no. 980G for $323,000 plus interest; and (4) an integrated tool handler, model no. IT28G for $134,500 plus interest. (*See* CX 1.)

In May 1998, NYSC approached CWTC with a potential new customer, Metropolitan Recycling ("Metropolitan"), that was interested in purchasing Caterpillar machines. (*See* Transcript of Hearing, dated Aug. 12, 2002 ("Aug.Tr."), at 101.) CWTC agreed to finance Metropolitan's purchase of two machines—an integrated toolcarrier, model no. IT24 and a material handler, model no. 325MH—so long as NYSC guaranteed Metropolitan's obligation. (*Id.*) NYSC agreed and secured Metropolitan's indebtedness to CWTC. (*See* CX 15; Aug. Tr. at 102.) A countertrade agreement was established between CWTC, NYSC, and Metropolitan whereby Metropolitan would ship crushed cars to NYSC worth at least $13,300 per month, and NYSC authorized CWTC to deduct an additional $13,300 per month from the proceeds of the sales of NYSC's scrap metal to pay off Metropolitan's debt. (*See* CX 15 at 1337; Aug. Tr. at 104.)

NYSC actually began shipping scrap metal in August 1998. (Statement of Douglas J. Weston, dated May 31, 2002 ("Weston Statement"), ¶ 52.) In January 2000, Carmine Agnello ("Agnello"), Steven Scala, Mark Lomonaco, and Joseph Burger—principals and employees of NYSC— were charged with enterprise corruption in violation of N.Y.P.L. § 460.20(1)(a). (*See* Proposed Findings of Fact and Conclusions of Law Submitted on Behalf of the United States of America, dated July 9, 2002 ("U.S. Findings of Fact"), Ex. 2.) NYSC continued to ship scrap for a few more months and CWTC continued to receive payments from customers. (*See* Aug. Tr. at 106.) CWTC collected a total of $1,254,304.88 after the arrest of NYSC's principals. This money was not forwarded to NYSC, but rather was applied to pay down NYSC's outstanding debts with CWTC. (*See* Aug. Tr. at 143, 174.) Eventually NYSC stopped shipping scrap metal and defaulted on its obligations to CWTC.

Around this same time Metropolitan also defaulted on its obligations to CWTC. On August 16, 2001, NYSC and its principals pled guilty. (*See* U.S. Findings of Fact ¶ A27.) As part of the plea, they agreed to forfeit to the United States the sum of ten million dollars to be satisfied, *inter alia*, by and through the sale of the assets of NYSC. (*Id.* ¶ A(28); *see also* Consent Order.) This Consent Order was approved by the court on September 7, 2001.

By motion dated September 5, 2001, CWTC petitioned the court to modify the restraining order to allow CWTC to foreclose on and take possession of the equipment that allegedly belonged to it. (*See* Motion, dated Sept. 5, 2001.) Judge Gershon conducted a hearing on October 10, 2001, during which it was determined that the proper way for CWTC to proceed was pursuant to 18 U.S.C. § 1963(*l*). (*See* Transcript of Hearing, dated Oct. 11, 2001, at 25–26.) On November 16, 2001, CWTC petitioned the court pursuant to 18 U.S.C. § 1963(*l*) to adjudicate its interests in the property of NYSC that had been ordered forfeited. (*See* Caterpillar World Trade Corporation Petition for Hearing, dated Nov. 16, 2001.) Specifically, CWTC is seeking to have six machines and funds covering advance payments, expenses, and a guaranty agreement excluded from those assets to be forfeited by NYSC to the government. (*See generally* CWTC Memorandum in Support of its Petition under 18 U.S.C. § 1963(*l*), dated Sept. 5, 2002 ("CWTC Memo").) Both the United States and Agnello oppose CWTC's motion.

### DISCUSSION

CWTC brings this claim pursuant to 18 U.S.C. § 1963(*l*), which offers one asserting a legal interest in forfeited property an opportunity to establish the validity and superiority of its right to the forfeited

property. *See* § 1963(*l*)(2)-(6). Under § 1963(*l*), both the petitioner and the government may present evidence and witnesses at a hearing so that the court can determine whether the petitioner's interest in the property is superior to the defendant's pre-forfeiture interest, or if the petitioner was a bona-fide purchaser. *See* 18 U.S.C. § 1963(*l*)(6)(A)-(B). In this case CWTC claims that it is entitled to the property at issue pursuant to § 1963(*l*)(6)(A).[2] Section 1963(*l*)(6)(A) states in pertinent part:

> If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that -
>
> (A) the petitioner has a legal right, title, or interest in the property, and such right, title or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section ... the court shall amend the order of forfeiture.

18 U.S.C. § 1963(*l*)(6)(A). If the third-party establishes by a preponderance of the evidence that it meets the above requirements, the court must amend the order of forfeiture. *See* 18 U.S.C. § 1963(*l*)(6).

Based on the above statute, the Second Circuit in *United States v. Schwimmer*, 968 F.2d 1570 (2d Cir.1992), established a five-pronged test that must be satisfied if a petitioner is to be granted an amendment of an order of forfeiture under § 1963(*l*)(6)(A). Those five elements are:

(i) The petitioner must assert a *right, title or interest;*

(ii) that right, title, or interest must be *in property which has been forfeited* to the United States[3] pursuant to § 1963;

(iii) that right, title or interest must be *legal;*

(iv) that right, title or interest must *render the order of forfeiture invalid in whole or in part;*

(v) the reason that it renders the order of forfeiture invalid, in whole or in part, must be that either: (a) the third party's interest in the property ordered forfeited was *vested* at the time of the commission of acts in question, or (b) the third party's interest in the property ordered forfeited was *superior* to the defendant's interest at the time of the commission of the acts.

*Schwimmer,* 968 F.2d at 1580–81 (emphasis in original). Applying this test, the property at issue will be evaluated in turn.

### I. *Four Original Caterpillar Machines and American Pulverizer Machine*

CWTC seeks, pursuant to § 1963(*l*)(6)(A), to exclude four Caterpillar machines and an American Pulverizer machine from the NYSC assets that the court ordered forfeited to the United States. In order to have standing to bring this action, CWTC must show that it has a legal right, title, or interest in the property being forfeited. *See* 18 U.S.C. § 1963(*l*)(6)(A). In this case, the United States and Agnello

---

**2.** Although CWTC claimed earlier in the case that it was also a bona fide purchaser as set forth in § 1963(*l*)(6)(B), it has since dropped that contention. (*See* Aug. Tr. at 3.)

**3.** 18 U.S.C. § 1963(*l*)(2). Although § 1963(*l*)(6)(A) only refers to "the property,"

the Second Circuit reasoned in *Schwimmer* that the most natural assumption was that this phrase has the same meaning as the longer phrase used in § 1963(*l*)(2), which states: "the property ordered forfeited to the United States...."

concede that CWTC not only has standing to bring this specific claim, but that it has a legal right to this equipment. (*See* Government's Post–Ancillary Hearing Memorandum in Opposition to Petitioner Filed by CWTC, dated Oct. 11, 2002 ("Gov't Oct. Post–Ancillary Memo"), at 1–2; Transcript of Hearing, dated Nov. 7, 2002 ("Nov.Tr.") at 2–3, 39; Government's Supplemental Post–Ancillary Hearing Memorandum in Opposition to Petition Filed by CWTC, dated Dec. 23, 2002 ("Gov't Dec. Post–Ancillary Memo") at 1–2.) They also concede that CWTC's security interests in the original four Caterpillar machines (*e.g.* model no. 350 MH, model no. 325 MH, model no. 980G, and model no. IT28G) and the American Pulverizer were perfected in a timely manner. (*See* Gov't Oct. Post–Ancillary Memo, at 2–3.) Accordingly, this claim satisfies each of the five prongs set out in *Schwimmer.* I therefore respectfully recommend that the Consent Order be amended to exclude these five machines or the proceeds thereof in order to satisfy NYSC's outstanding debt obligations to CWTC for these five machines.

## II. *Material Handler. Model No. 320 MH*

The United States claims that the March 23, 1998 amendment to CWTC's original agreement with NYSC did not expressly state that a security interest was granted to either H.O. Penn[4] or CWTC in the Material Handler, model no. 320 MH. Therefore, according to the United States, CWTC did not have a secured interest in the 320 MH—leaving it as a general creditor without standing in this action. Alternatively, the United States argues that even if CWTC did have an interest in the 320 MH, it was not perfected until October

2001, after the Consent Order was filed, giving the United States priority as a creditor. CWTC disagrees, arguing that the March 23, 1998 amendment was a modification of the original contract and that the terms of the original agreement still applied. This court agrees.

■ "A modification is an agreement to abridge or amend an enforceable contractual duty under an existing agreement." *Ludwig v. NYNEX Serv. Co.*, 838 F.Supp. 769, 797 (S.D.N.Y.1993). A modification to a contract leaves intact those provisions of the original agreement that are not directly inconsistent. *See Marine Transp. Lines, Inc. v. International Org. of Masters, Mates & Pilots*, 878 F.2d 41, 46 (2d Cir.1989) ("[m]odifications do not necessarily abrogate the original contract entirely; indeed, the terms of the old contract are still to be followed so far as not changed or as inconsistent with the new terms") (internal citations omitted). *Accord Banque Nationale de Paris v. Batmanghelidj*, 108 F.3d 1369, 1997 WL 138944, at *2 (2d Cir. Mar.18, 1997) ("when a new agreement merely modifies an earlier agreement, any provisions of the earlier agreement that are consistent with the modified version will survive"); *Chicago College of Osteopathic Med, v. George A. Fuller Co.*, 776 F.2d 198, 208 (7th Cir.1985) (a modification of a contract is a change that introduces new elements into the original contract, but leaves the general purpose and effect undisturbed); *Eagle Star Ins. Co. v. Seneca Ins. Co.*, No. 94 CIV. 9106, 1995 WL 733642, at *5 (S.D.N.Y. Dec.12, 1995) (same).

■ In this case, the March 23, 1998

---

4. H.O. Penn was the original financier and a party to all agreements between CWTC and NYSC and Metropolitan Recycling. In each contract, H.O. Penn immediately assigned all its rights to CWTC, including its priority security interests. (*See* CX 1, CX 3, CX 4, CX 15.) H.O. Penn is not a party in this case.

Amendment[5] is clearly a modification of the earlier July 22, 1997 agreement. The March 1998 amendment states expressly that it is an amendment of the original agreement, suggesting that all the undisturbed provisions should continue. For example, the amendment does not expressly refer to the barter agreement used for payments, although both parties clearly intended that portion of the original agreement to continue. Moreover, the parties use terms in the amendment that are not defined except in the original agreement, such as "Dealer" and "Machine." In fact, the amendment uses the term "Machine," which was defined in the original agreement as "an all Caterpillar fleet of new machinery," to refer to the 320MH. (CX 3.) As a modification, the March 1998 agreement does not disturb the general provisions of the original contract. Thus, the new amendment is not inconsistent with the portion of the original agreement which states:

> 6. SHREDDER hereby grants to PENN a continuing security interest in MACHINES including: attachments accessories, optional features installed or not, substitutions, replacements, additions, and proceeds of all of the foregoing to secure payment of SHREDDER's indebtedness.

> 7. PENN hereby assigns security interest in clause 6 to CWTC, and PENN hereby represents and warrants to CWTC that CWTC has a valid, perfected, first priority security interest in the MACHINES and all other items described in clause 6.

(CX 1, ¶¶ 6–7.) Therefore, CWTC was granted a security interest in the 320MH machine and has standing to proceed as a secured creditor.[6]

---

5. *The Agreement dated July 22, 1997* among New York Shredder Corp., 1340 East Bay Avenue, Bronx, New York 11435 ("SHREDDER"), Caterpillar World Trading Corporation, 100 N.E. Adams Street, Peoria, IL 61629–2470 ("CWTC"), and H.O. Penn Machinery Company, Inc., 699 Brush Avenue, Bronx, New York, 10465–1806 ("PENN") is *amended* as below:

> \* \* \* \* \* \*

> SHREDDER shall purchase from DEALER one additional piece of Caterpillar equipment (320MH) for a purchase price of $230,000 including applicable taxes, and on such additional terms and conditions as may be agreed upon between SHREDDER and PENN.
> CWTC will purchase from PENN the SHREDDER RECEIVABLE for the 320MH, including applicable taxes, in connection with the MACHINE 10 days following fax receipt of Delivery Report, MACHINE invoice and UCC filing assigned to CWTC.

(*See* CX–3) (emphasis added).

6. It is also possible that the terms of the original agreement were incorporated by reference into the March 1998 amendment. Under New York law, and the law of the Second Circuit, a document will be deemed to have been incorporated by reference into another instrument or agreement if two requirements are met. First, the agreement must specifically reference and sufficiently describe the document to be incorporated, such that the latter "may be identified beyond all reasonable doubt." *Ryan. Beck & Co. v. Fakih*, No. 02 CV 4052, 2003 WL 21437079, at \*8 (E.D.N.Y. Jun.20, 2003) (quoting *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1198 (2d Cir. 1996)). Second, "it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms." *Id.* (quoting *PaineWebber*, 81 F.3d at 1201).

In this case, the March 1998 amendment clearly and specifically referenced the original agreement between the parties, thus satisfying the first requirement. Although both parties' assent to the incorporated terms of the original agreement can be inferred for the reasons discussed above, it is not necessary for the court to examine this theory any further. The amendment is clearly a simple modification of the original contract, leaving the undisturbed portions of the original contract intact.

In the alternative, the United States argues that even if CWTC's interest in the 320MH was secured, it was not perfected before the Consent Order was approved and thus does not have priority over the United States' interest in forfeiture. CWTC argues, however, that its security interest in the 320MH was enforceable against NYSC as soon as that interest attached, and that perfection is irrelevant. Section 1963(*l*)(6) states that a petitioner need only show that its "legal right, title, or interest in the property was *vested* in the petitioner rather than defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property" at issue. *See* 18 U.S.C. § 1963(*l*)(6)(A) (emphasis added). The United States argues that "vested" as used in § 1963(*l*) should mean perfected, although it has not provided any authority for this proposition, and the court's research has uncovered none.[7] Nowhere does § 1963(*l*) state that the petitioner's interest must be perfected, only that it must be superior to that of the debtor. Under New York law, a secured creditor need not perfect its interest to have rights superior to the debtor. *See* N.Y.U.C.C. § 9–203(a) (McKinney 2002); *see also Cantrade Private Bank Lausanne Ltd. v. Torresy*, 876 F.Supp. 564, 573 n. 7 (S.D.N.Y.1995) ("A secured creditor need not perfect its interest to have rights superior to the debtor. So long as a security interest has attached, it is enforceable against the debtor"); *Continental Coffee Prods. Co. v. Banque Lavoro S.A.*, 852 F.Supp. 1235, 1237 (S.D.N.Y.1994) (reasoning that once the security interest as attached, the interest is enforceable according to the terms of the agreement, giving

the secured party certain rights to the collateral); *Evingham v. Trucking Affiliates of Cent. New York Credit Union*, 27 B.R. 128, 129 (Bkrtcy.W.D.N.Y.1983) ("A security agreement is not invalid between the parties merely because it was not perfected. Perfection of an interest is important only to insure priority of the lien over intervening third-parties") (internal citations omitted). Rather, a petitioner's interests become enforceable against a debtor at the moment of attachment. *See* N.Y.U.C.C. § 9–203; *United States v. Delco Wire and Cable Co.*, 772 F.Supp. 1511, 1520 n. 1 (E.D.Pa.1991) (in a proceeding pursuant to § 1963(*l*) whereby a third party is petitioning to have assets removed from the property forfeited to the government, and the third-party is the only creditor claiming an interest in the property, it does not matter whether the security interest was perfected); *see also Continental Coffee Prods.*, 852 F.Supp. at 1237.

A security agreement attaches when three requirements are met: (1) value has been given; (2) the debtor has rights in the collateral; and (3) the debtor has signed a security agreement that contains a description of the collateral. *See* § 9–203; *see also Cantrade Private Bank Lausanne*, 876 F.Supp. at 572; *Continental Coffee Prods.*, 852 F.Supp. at 1237; *Delco Wire and Cable Co.*, 772 F.Supp. at 1520. These requirements have been met in this case. A security agreement exists that specifically describes the collateral (*i.e.* the 320MH), gives NYSC rights in the collateral, and sets up a payment schedule for value. (*See* CX 3.) Thus, CWTC's security interest became enforceable against NYSC upon delivery of the 320MH in July 1998. (Weston Statement ¶ 34.) This date

---

7. The Second Circuit has stated that "the categories of vested and superior are intended to cover those cases where the court lacks jurisdiction over the property because it is not

really 'property of the defendant.'" *See Schwimmer*, 968 F.2d at 1581 (citation omitted) (emphasis omitted).

preceded the start of business at NYSC in August 1998; thus CWTC's interest was superior to NYSC's "at the time of the commission of the acts which gave rise to the forfeiture of the property."[8] 18 U.S.C. § 1963(*l*)(6)(A).

■ Section 9–317 of the N.Y.U.C.C. lists certain types of creditors that are exceptions to the above rule, giving them priority over unperfected security interests. The United States argues that it is an exception because it became a lien creditor[9] by virtue of the Consent Order and therefore had priority over CWTC's unperfected security interest. *See* N.Y.U.C.C. § 9–317. There is little case law on whether the government can be considered a lien creditor in the civil forfeiture context. Cases looking at this issue as presented under 21 U.S.C. § 853(n)(6)[10] have held that in the forfeiture context, the government does not take on the role of a lien creditor. *See State v. One 1979 Pontiac Trans Am*, 771 P.2d 682, 685 (Utah Ct.App.1989) (the state does not fall into any of the classes mentioned in the statute and thus does not have statutory superiority over an unperfected security interest); *MBank Grand Prairie v. State*, 737 S.W.2d 424, 426 (Tex.App.1987) (the state does not fall within any one of the five classes of creditors that have statutory superiority over an unperfected security interest). Cases under § 1963 have held that the effect of a verdict of forfeiture is

to put the government into the shoes of the criminal defendant, thus restricting its succession only to those rights that the defendant had in the property. *See United States v. Ida*, 14 F.Supp.2d 454, 459 (S.D.N.Y.1998); *see also United States v. Stowell*, 133 U.S. 1, 16–17, 10 S.Ct. 244, 33 L.Ed. 555 (1890) (the government can succeed to no interest greater than that of the wrongdoer); *United States v. Lavin*, 942 F.2d 177, 185 (3d Cir.1991) (interpreting the language in § 1963(*l*)(6)(A) to mean that "if a third party's interest in the forfeited property, at the time of the criminal acts, was superior to the criminal defendant's interest, then the interest that the government acquires when it steps into the defendant's shoes is subordinate to that of the third party"); *United States v. Porcelli*, No. 85 CR 756, 1992 WL 355584, at *2 (E.D.N.Y. Nov. 5, 1992) ("[A] court must determine whether petitioner's interest in the property is superior to *defendant's* pre-forfeiture interest") (emphasis added). In fact, in *Schwimmer* the Second Circuit held that an order of forfeiture was invalid in whole or in part if the petitioner's interests were found to be superior to that of the *debtor* at the relevant time. *See Schwimmer*, 968 F.2d at 1580; *see also United States v. Gilbert*, 244 F.3d 888, 919 (11th Cir.2001) (finding that "[b]ecause it seeks to penalize the defendant for his illegal activities, *in personam* forfeiture reaches only that property, or portion

---

**8.** Pursuant to 18 U.S.C. § 1963(c), "all right, title, and interest in property [subject to criminal forfeiture] vests in the United States upon the commission of the act giving rise to the forfeiture . . . ." Even if the court assumes that the illegal act began when NYSC began shipping scrap metal, in August 1998, this was after the date on which the 320MH was delivered, in July 1998. (Weston Statement ¶ 34.)

**9.** A lien creditor is listed under New York Uniform Commercial Code § 9–317(a)(2)(A) as one of the limited classes of entities that

takes priority over unperfected security interests.

**10.** The Second Circuit has held that "[t]he language of 21 U.S.C. § 853(n)(6) is 'substantially identical' to that of 18 U.S.C. § 1963(*l*)(6), which deals with forfeiture after conviction under RICO, and we therefore [can] refer to cases discussing the two statutes interchangeably." *United States v. Ribadeneira*, 105 F.3d 833, 835 (2d Cir.1997) (citations omitted).

thereof, owned by the defendant.... Stated another way, the property itself is not forfeited; rather, the defendant's interest in the property is forfeited") (internal citations omitted); *Ida*, 14 F.Supp.2d at 459 (finding that the effect of a verdict of forfeiture is to put the government into the shoes of the criminal defendant—it succeeds to whatever interest the defendant had in the property). Therefore, the Consent Order in this case gave the United States only the rights that NYSC had in its property and NYSC's rights in the 320MH were subordinate to those of CWTC as of the date of attachment. I therefore respectfully recommend that the Consent Order be amended to exclude the 320MH or the proceeds thereof.

During the November 7, 2002 hearing the United States conceded that CWTC was due the outstanding debt on the machines in which it had a security interest plus interest. (*See* Nov. Tr. at 39–40.) Its concern was with how the interest amount was calculated—on just five, or all six machines. (*See id.*) Since this court has found that CWTC had a superior security interest in all six machines, the United States' concern is now moot. CWTC is entitled to interest on all outstanding machine debt for the six noted machines, as per the contract, up to the date of the final judgment in this case.

### III. *Future Advances & Expenses*

 CWTC claims that it is entitled to $1,099,858.23 in expenses (*see* CWTC Proposed Findings of Fact, dated May 31, 2002, ¶ 86), and $1,668,374 in future advances (*see id.* ¶ 94), paid on behalf of NYSC that were never reimbursed.

NYSC argues that this is an unsecured interest and that, therefore, CWTC is a general creditor and has no standing to bring these claims here. (*See* Gov't Dec. Post–Ancillary Memo. at 1–4.) Although a general creditor may have the right to receive payment, such a creditor has no interest in particular assets or funds of the defendant and thus cannot meet the five-pronged standard set out in *Schwimmer* to establish standing.[11] *See Schwimmer*, 968 F.2d at 1580–81. A claim of entitlement to payment is not the same as claiming an ownership interest in seized accounts. *See United States v. All Funds on Deposit on or Before November 8, 1994 in Citibank Account Number 42773634 In The Name of Kahn*, 955 F.Supp. 23, 26 (E.D.N.Y.), *aff'd*, 129 F.3d 114, 1997 WL 701366 (2d Cir.1997). "[A]n interest 'in' property must be an interest in a particular, specific asset, as opposed to a general interest in an entire forfeited estate or account." *Ribadeneira*, 105 F.3d at 836. CWTC has claimed numerous times that it need not reassert standing for each component of its claim, but that standing for the machines is sufficient to cover all related claims. However, CWTC has provided no legal support for this contention, and the court is aware of none. To establish standing in a civil forfeiture proceeding, the claimant must demonstrate some ownership or possessory interest in the property at issue. *See Kahn*, 955 F.Supp. at 26 (citing *United States v. One 1982 Porsche 928*, 732 F.Supp. 447, 451 (S.D.N.Y.1990)). In other words, the possessory or ownership interest must be in the specific forfeited property. *See id.* (citing *United States v. Coluccio*, 51 F.3d 337, 339 (2d Cir.1995)). Here, CWTC has not established an own-

---

**11.** In the alternative, CWTC claims that even if it is deemed a general creditor, it still has standing under *United States v. Reckmeyer*, 836 F.2d 200, 205–06 (4th Cir.1987), in which the court allowed standing for general credi-

tors where all of the assets of the debtor were ordered forfeited. However, the Second Circuit has explicitly declined to adopt the *Reckmeyer* holding. *See Ribadeneira*, 105 F.3d at 836 n. 4.

ership in specific funds that were ordered forfeited. Rather, it has only established a right to payment. Therefore, CWTC is a general creditor and does not have standing to bring this claim in this action.

Alternatively, CWTC now contends that its security interest in the six machines guaranteed all of NYSC's indebtedness, including any subsequent expenses and advances paid. (*See* Nov. Tr. at 12–13.) The United States argues that this would be an overly-expansive reading of the term "indebtedness" as used in the original contract. Under New York law, a security agreement may provide that collateral secures future advances. *See* N.Y. U.C.C. § 2–204 (McKinney 2002). This is usually done through what is called a "dragnet clause" or a "future advances clause." Traditionally, courts interpret these types of clauses liberally. *See In the Matter of Riss Tanning Corp.,* 468 F.2d 1211, 1213 (2d Cir.1972). However, the contractual provision must be clear and unambiguous, providing sufficient notice to subsequent creditors. *Id.* A court should "neither interpret away the obvious meaning of the words involved nor supply additional meanings to them." *Id.* In this case, the clause that CWTC argues secures all of NYSC's indebtedness reads:

> SHREDDER hereby grants to PENN a continuing security interest in MACHINES including: attachments, accessories, optional features installed or not, substitutions, replacements, additions, and proceeds of all of the foregoing to secure payment *of SHREDDER's indebtedness.*[12]

(CX 1, ¶ 6.). This provision is not sufficiently clear and unambiguous. It does not indicate that any type of future advance might be included in NYSC's "indebtedness" or even define the term "indebtedness." *See Riss Tanning,* 468 F.2d at 1213 (upholding a dragnet clause which stated that the equipment was security for the note "as well as for the payment of any other obligation or liability ... due or to become due whether now existing or hereafter arising"); *In re Prichard,* 170 B.R. 41, 42 (Bkrtcy.N.D.N.Y.1994) (upholding a dragnet clause which stated "[t]o secure the payment and performance of all of the Obligations, Borrower hereby grants to Bank a continuing security interest in ... the Collateral" where "obligations" was defined to include "all indebtedness, liabilities, obligations, covenants, and duties of Borrower to Bank ... now existing or hereafter arising"); *In re Wetzel,* 134 B.R. 718, 719 (Bkrtcy.W.D.N.Y.1992) (declining to uphold a dragnet clause which stated "Security to make sure I pay back this loan and meet all of my obligations to you at any time ..." because the clause did not define "obligations" or include the language "now existing or hereafter existing"). I therefore respectfully recommend that the Consent Order not be amended to exclude payments to reimburse CWTC for future advances and expenses.

### IV. *Metropolitan Recycling*

In May 1998 CWTC financed the purchase of two Caterpillar machines [13] by Metropolitan Recycling. (*See* CX–15.) It did so only on the condition that NYSC guarantee Metropolitan's debt, and NYSC agreed. (*Id.*) Additionally, CWTC obtained security interests from Metropolitan in both Caterpillar machines (*see* CX 15), which were perfected in December

---

12. H.O. Penn then assigned this security interest to CWTC. (*See* CX 1, ¶ 7.)

13. The two machines purchased by Metropolitan were a Caterpillar Integrated Tool Carrier, model no. IT24 for $110,000 plus interest and a Caterpillar Material Handler, model no. 325MH for $320,000 plus interest. (*See* CX 24–25.)

1998. (*See* CX 38–39.) Metropolitan defaulted on its obligations shortly after NYSC stopped shipping scrap metal in January 2000. CWTC now contends that it is entitled to collect Metropolitan's outstanding debt from NYSC as guarantor and that the Consent Order should be amended as such.

 As explained above, the Second Circuit in *Schwimmer* laid out a five-pronged test that must be satisfied if a petitioner is to be granted an amendment of an order of forfeiture under § 1963(*l*)(6)(A). After a thorough review of all of the evidence and transcripts in this case, it appears that the second prong in *Schwimmer*, "that right, title, or interest must be *in property which has been forfeited* to the United States pursuant to § 1963," cannot be met in this instance. *See also Coluccio*, 51 F.3d at 339; *Kahn*, 955 F.Supp. at 26; *One 1982 Porsche 928*, 732 F.Supp. at 451. The United States and Agnello have repeatedly assured the court, both in papers and in person, that the two Metropolitan machines at issue are not included in the property that is being forfeited pursuant to the Consent Order. (*See* Nov. Tr. at 31, 60, 63; Gov't Oct. Post–Ancillary Memo, at 23.) CWTC counters that Agnello admitted during settlement discussions that the two machines were in the custody, care, and control of NYSC. Whether this information obtained during settlement negotiations is admissible need not be decided here. Section 1963(*l*) clearly states that petitioner must have a right, title, or interest in property that has been forfeited. *See* 18 U.S.C. § 1963(*l*)(6)(A); *Schwimmer*, 968 F.2d at 1580–81; *Kahn*, 955 F.Supp. at 26. Because CWTC cannot satisfy this element of

the statute, it lacks standing to bring this claim in this cause of action. Accordingly, I respectfully recommend that the Consent Order not be amended to exclude the Metropolitan machines or their proceeds.

## V. $1,254,304.88 Collected Subsequent to Arrest

Section § 1963(e) provides in pertinent part:

> Upon conviction of a person under this section, the court shall enter a judgment of forfeiture of the property to the United States and shall also authorize the Attorney General to seize all property ordered forfeited upon such terms and conditions as the court shall deem proper. Following the entry of an order declaring the property forfeited, the court may, upon application of the United States ... take any other action to protect the interest of the United States in the property ordered forfeited.

18 U.S.C. § 1963(e). Pursuant to this section, the United States brings its own claim seeking forfeiture of the $1,254,-304.88 [14] that CWTC admits to collecting on behalf of NYSC subsequent to the January 2001 arrests. The United States is presumably trying to protect its interest in "property ordered forfeited." It is the United States' position that Agnello and other NYSC principals have admitted that the money is proceeds from their racketeering operation and thus, pursuant to § 1963(a), belongs to the United States. (*See* Aug. Tr. at 187–88.) CWTC disagrees, stating that it was entitled to deduct advances, expenses, and monthly installment payments in the ordinary course of business and that therefore the money belongs to it. [15] (*See* Ex Parte Post–Indict-

---

14. CWTC collected $72,139.25 for cars shipped prior to January 21, 2000, $540,843.73 for cars shipped after January 21, 2000, and $641,321.90 for scrap metal

shipped by NYSC. (*See* CX 76, at 3941; Demmin Statement ¶ 39.)

15. CWTC claims that after it received the money, it proceeded to deduct advances, ex-

ment Restraining Order, dated Mar. 3, 2000 ("Restraining Order"), ¶¶ 2–3, 7.) Neither party has submitted any legal support to justify its position.[16] Both parties agree that if the court determines that the money belongs to CWTC, any award granted to CWTC must be offset by the 1.2 million dollars.

 The United States has the burden of proving that the money is traceable to the defendants' racketeering activity and is thus forfeitable. *See* 18 U.S.C. § 1963(a); *Delco Wire & Cable*, 772 F.Supp. at 1517. Agnello and NYSC have stated that this money constitutes proceeds of defendants' racketeering activity. (*See* Aug. Tr. at 188.) Alone, these admissions cannot satisfy the United States' burden of proof. The court recognizes the significant benefit to the defendants if this money is ordered forfeited, and since there is no additional evidence to support their statements, common sense suggests that these admissions are self-serving. (*See id.*) Moreover, in the Restraining Order issued by Judge Gershon in March 2000, NYSC was authorized to continue making payments and other transactions in the "ordinary course of business." (*See* Restraining Order §§ 2–3.) In the Restraining Order, "ordinary course of business" is defined as various types of arms length expenditures and transactions, including:

a. purchase and/or use of inventory, supplies and equipment;

b. payment of business liabilities including but not limited to accounts payable, mortgage and contract for deed payments, insurance premiums, license fees, utilities and taxes that existed at the time of the signing of this order an[d] those which arise hereafter;

c. rental or lease payments for the necessary use of supplies and equipment;

d. payment of reasonable business salaries; and

e. payment for the normal upkeep or maintenance of any real property, equipment, inventory, supplies or furnishings necessary for ordinary business operations.

(*See* Restraining Order ¶ 7.) This provision appears to allow NYSC to continue its contractual obligations, including providing payment, to CWTC. Furthermore, CWTC received the 1.2 million dollars prior to the entry of the Consent Order in what appears to be an arms-length transaction occurring in the ordinary course of business. This money was received from clients that, according to the original contract, CWTC not only located, but for whom it placed orders and provided the advance funding to facilitate the shipping of scrap from NYSC. (*See* CX 1.) The United States has made no showing that these funds were transferred to CWTC to avoid a forfeiture. In fact, if these business transactions occurred as they had in the past, pursuant to the contract, then NYSC had no contact with the money at all—it only received money after CWTC deducted advances, expenses, and monthly payments and then forwarded any overage to NYSC. (*See id.*) The United States has not met its burden of proof to show that the entire 1.2 million dollars is forfeitable. According to the Restraining Order, CWTC was entitled to collect this money from customers, deduct expenses and advance payments for those shipments, and

penses, and monthly installment payments. It is CWTC's contention that NYSC's debts exceeded the payments received for scrap, thus leaving no money remaining to forward to NYSC. (*See* Aug. Tr. At 190.)

16. There is no provision in the original 1997 contract that contemplates non-payment by NYSC.

collect monthly installment payments, before shipping the remainder, if any, to NYSC as profit. Only the overage, if any, must be returned to NYSC and is forfeitable to the government. I respectfully recommend that the Consent Order be amended as such.

## CONCLUSION

In summary, I recommend that CWTC's motion to amend the Consent Order pursuant to § 1963(*l*) be granted in part and denied in part. Specifically, I recommend that the Consent Order be amended to exclude all six machines at issue (*e.g.* (1) Caterpillar material handler, model no. 350 MH; (2) Caterpillar material handler, model no. 325 MH; (3) Caterpillar wheel loader, model no. 980G; (4) Caterpillar integrated tool handler, model no. IT28G; (5) American Pulverizer; and (6) Caterpillar Material handler model no. 320 MH) or the proceeds thereof in the amount necessary to fulfill NYSC's outstanding machine debt obligations to CWTC, plus interest. Additionally, I recommend that CWTC be permitted to keep the $1,254,304.88 to the extent that money was used to reimburse CWTC for advances, expenses, and monthly payments due at the time. Any overage must be turned over to the defendants.

Any objection to this Report and Recommendation must be filed with the Clerk of Court, with courtesy copies to Judge Gershon and to my chambers, within ten (10) business days. Failure to file objections within the specified time period waives the right to appeal the district court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Oct. 3, 2003.